OPINION OF THE COURT
Bellacosa, J.
Wildenstein & Co., a dealer in fine art, seeks relief under a settlement agreement between itself and Hal Wallis, now deceased, pursuant to which Wildenstein returned to Wallis in 1982 two valuable paintings, Monet’s "Houses of Parliament” and Gauguin’s "The Siesta — A Brittany Landscape”. In exchange, the agreement gave Wildenstein preemptive and exclusive consignment rights with respect to 15 original paintings by renowned artists in Wallis’s collection. Wildenstein’s lawsuit, begun in the United States District Court for the Southern District of New York, named the Estate of Hal B. Wallis, the Hal B. Wallis Trust, the Hal B. Wallis Foundation and Brent Wallis as defendants. The defendants resisted Wildenstein’s claims by invoking the Rule against Perpetuities (EPTL 9-1.1) and the common-law rule against unreasonable restraints on alienation of property.
This lawsuit comes to us from the United States Court of Appeals for the Second Circuit, which certified four questions arising out of an appeal in that court from the District Court’s dismissal of the Wildenstein complaint:
"(1) Does the New York Rule Against Perpetuities apply to preemptive rights and future consignment interests in personal property?
"(2) Does the New York common law rule against unreasonable restraints on alienation invalidate preemptive rights and future consignment interests in personal property?
"(3) If either the Rule Against Perpetuities or the *645 common law rule against unreasonable restraints on alienation invalidates the preemptive rights and future consignment interests at issue here, can the beneficiary of those rights assert a claim for unjust enrichment stemming from the loss of such rights and interests?
"(4) If either the Rule Against Perpetuities or the common law rule against unreasonable restraints on alienation invalidates the preemptive rights and future consignment interests at issue here, can the beneficiary of those rights and interests nevertheless state a claim for fraudulent inducement and fraud arising from the transaction that gave it such rights and interests?” (949 F2d 632, 636.)
On January 16, 1992, we accepted the certified questions (see, NY Const, art VI, § 3 [b] [9]; 22 NYCRR 500.17).
The first two questions are not academic abstractions and must be construed in the context of the real case in controversy in order to provide meaningful and appropriate answers. We must determine whether the New York statutory Rule against Perpetuities applies to invalidate Wildenstein’s preemptive and consignment rights, or whether the common-law rule against unreasonable restraints on alienation is transgressed. We conclude in the negative as to those two questions and, therefore, need not address the third and fourth questions relating to alternative relief.
I.
Hal Wallis, a California-based film producer whose credits included "Casablanca”, avidly collected Impressionist and Modern works of art. In late 1980, Wallis’s wife, Martha Hyer Wallis, apparently gave, without his knowledge, paintings from the collection, including "Houses of Parliament” and "The Siesta — A Brittany Landscape”, to several individuals in exchange for an anticipated loan to her of approximately $1 million. In January 1981, two of these individuals went to Wildenstein’s New York City offices offering to sell the Monet and the Gauguin. They produced a power of attorney and other documents purporting to grant them authority to sell the paintings for Mrs. Wallis. Wildenstein purchased the two paintings for $650,000.
Hal Wallis learned that Wildenstein had his Monet and *646 Gauguin in August 1981. Through his attorney, he sought to retrieve the paintings, informing Wildenstein that the paintings had been sold without his permission. On April 20, 1982, following lengthy negotiations, Wildenstein and Wallis reached a formal settlement agreement pursuant to which Wildenstein returned the two paintings to Wallis in exchange for $665,000, representing the $650,000 Wildenstein paid for them plus $15,000 for expenses. The settlement agreement provides that Wildenstein would have a right of first refusal to purchase and an exclusive right of consignment to auction 15 named paintings in the Wallis collection. The first refusal right, sometimes also referred to as a preemptive right, requires Hal or Martha Wallis to give Wildenstein at least 30 days prior notice of the terms of any proposed sale of a painting covered by the settlement agreement, and provides that Wildenstein shall have the option to purchase such painting within 20 days on the same terms as the triggering purchase offer. The exclusive right of consignment requires that, in the event the Wallises decide to sell any painting at auction, the painting shall be consigned exclusively to Wildenstein for six months. The agreement recites the parties’ intent that "Wildenstein shall have the first opportunity to purchase or sell all paintings listed”. The terms of the settlement agreement are applicable to the "executors, successors and assigns” of the Wallises and Wildenstein. However, the agreement specifically excludes any painting given to a charitable organization exempt from tax under Internal Revenue Code § 501 (c) (3) (26 USC § 501 [c] [3]).
Hal Wallis died in October 1986. Pursuant to the terms of the Hal B. Wallis Trust as amended in 1985, most of the paintings in the Wallis collection were distributed to the Hal B. Wallis Foundation, a tax-exempt charitable organization, which was to arrange to have the paintings displayed at the Los Angeles County Museum of Art. Under the terms of the Wallis Trust, Renoir’s "Jeune Filie au Chapeau a Coquelicots”, one of the paintings covered by the settlement agreement, passed to Hal Wallis’s son, defendant Brent Wallis, subject to his guarantee not to sell the painting. In December 1986, Brent Wallis nevertheless sold the Renoir for $750,000.
In early 1989, Wildenstein learned that the Hal B. Wallis Foundation intended to sell other paintings listed in the settlement agreement at an auction to be held on May 10, 1989 at Christie’s in New York. On May 9, 1989, Wildenstein sued Brent Wallis, the Wallis Trust, the Wallis Foundation *647 and the Wallis Estate in the United States District Court. The complaint was dismissed by the District Court, which granted summary judgment to the Wallis defendants (756 F Supp 158).
The District Court declined to decide whether Wildenstein’s rights under the settlement agreement are immune from the New York Rule against Perpetuities under Metropolitan Transp. Auth. v Bruken Realty Corp. (67 NY2d 156). Instead, that court rested its decision on the common-law rule against unreasonable restraints on the alienation of property. It rejected Wildenstein’s claims under the settlement agreement, stating: “these private restrictions on the transferability of the Wallis paintings did not further any countervailing public interest in the purchase and sale of works of fine art or otherwise facilitate such transactions” (756 F Supp 158, 164-165, supra).
II.
At the outset of our analysis, it is important to place the Wildenstein/Wallis agreement and the respective benefits and obligations of those contracting parties in perspective. Wildenstein is a commercial art dealer and Wallis was an avid art collector. They settled a dispute over valuable art works of world-wide renown. That settlement boomeranged into this controversy that dissolves under a remarkable old doctrine— the Rule against Perpetuities. That the principles of the 1682 Duke of Norfolk’s Case (3 Ch Cas 1) should emerge to dominate this modern commercial transaction is a royal irony that does not serve the common-law policy designed to block long-term retention over property by long-gone ancestors.
The Rule against Perpetuities and the common-law rule against unreasonable restraints on alienation both limit the ability of owners to control future dispositions of their property. The New York Rule against Perpetuities, codified at EPTL 9-1.1, provides that (1) any present or future estate is void if it suspends the absolute power of alienation for a period beyond lives in being at the creation of the estate plus 21 years (EPTL 9-1.1 [a] [2]), and (2) any estate in property is invalid unless it must vest, if at all, within the same period (EPTL 9-1.1 [b]). The statutory rule against remote vesting (EPTL 9-1.1 [b]) is thus a rigid formula that invalidates any interest that may not vest within the prescribed time period (see, Turano, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 9-1.1, at 480; Morris and Leach, The *648 Rule Against Perpetuities, at 12 [2d ed 1962]). Because of its capricious consequences, the modern view of the rule has evoked its characterization as a “Reign of Terror” (Leach, Perpetuities in Perspective: Ending the Rule’s Reign of Terror, 65 Harv L Rev 721, 721-723 [1952]).
Somewhat in tandem, the common-law rule against unreasonable restraints on the alienation of property, which invalidates unduly restrictive controls on future transfers, erects a somewhat more flexible standard, requiring a case-by-case analysis that measures reasonableness of the restraint by its price, duration and purpose (Metropolitan Transp. Auth. v Bruken Realty Corp., 67 NY2d 156, 161-162, supra; Allen v Biltmore Tissue Corp., 2 NY2d 534). Despite their differences, however, both the statutory and common-law rules strive to strike a balance between society’s interest in the free alien-ability of property and the rights of owners to direct future transfers.
A.
We turn to the first question certified: whether the rule against remote vesting applies to Wildenstein’s rights under the settlement agreement.
The Rule against Perpetuities, though founded in a real property context, became generally applicable to interests in both real and personal property (see, Sherman v Richmond Hose Co. No. 2, 230 NY 462, 471). We have also held the rule applicable to options in real estate transactions (Buffalo Seminary v McCarthy, 58 NY2d 867, affg for reasons stated in parts I and II of opn below 86 AD2d 435 [Hancock, Jr., J.]). In certain contexts, preemptive rights may also be subject to the Rule against Perpetuities (see, Morrison v Piper, 77 NY2d 165, 170; Metropolitan Transp. Auth. v Bruken Realty Corp., 67 NY2d 156, 164-166, supra).
The instant settlement agreement grants Wildenstein two types of rights — preemptive rights, should the Wallises decide to privately sell any of the covered paintings, and exclusive consignment rights, should the Wallises decide to sell by auction. Preemptive rights differ significantly from options in that the holder of an option has the power to induce a transaction, while the holder of a preemptive right may purchase only if an owner decides to sell (see, Metropolitan Transp. Auth. v Bruken Realty Corp., supra, at 163; see also, LIN Broadcasting Corp. v Metromedia, Inc., 74 NY2d 54, 60). *649 While we have not addressed the applicability of the Rule against Perpetuities to future consignment rights, the parties have offered no distinction to justify treating such rights differently from preemptive rights. These two kinds of rights constitute future contingent interests in 15 paintings which can be triggered only by the Wallises’ decision to sell, privately or by auction.
To resolve the applicability of the Rule against Perpetuities with respect to Wildenstein’s rights, we must examine the history and purposes of the rule in the relevant context of this Court’s recent decisions in Metropolitan Transp. Auth. v Bruken Realty Corp. (67 NY2d 156, supra) and Morrison v Piper (77 NY2d 165, supra). The rule against remote vesting originated in the late 17th century to address donative transfers of land among family members. By curbing attempts by the landed gentry to control future generations’ ownership of their real property, the rule protected the public’s interest in the development of land and prevented undue concentrations of wealth and power (see, 5A Powell, Real Property fl 759 [1], at 71-2 — 71-4; Leach, Perpetuities in Perspective: Ending the Rule’s Reign of Terror, 65 Harv L Rev 721, 725-726). Although the limits imposed by the rule upon the power to control future ownership of property stem from a policy against the withdrawal of property from commerce, the rule against remote vesting struck a balance in allowing property owners to provide for family members they personally knew and those within the first generation after that class (see, 6 American Law of Property § 24.16, at 51 [1952]; see also, Dukeminier, A Modern Guide to Perpetuities, 74 Cal L Rev 1867, 1869-1870).
The Rule against Perpetuities thus began as a flexible balancing principle. Commentators became troubled as the rule acquired rigid encrustations over the centuries because it did not sufficiently lend itself in a modern setting to taking reasonable account of competing interests and evolving policies (see, Morris and Leach, The Rule Against Perpetuities, at 12-13 [2d ed 1962]; Dukeminier, A Modern Guide to Perpetuities, op. cit., at 1869-1870). Professor Leach found the extension of the rule to modern commercial transactions, such as option agreements, a "step of doubtful wisdom” which, he suggested, ought to be the outer limits of its application to commercial contractual responsibilities (see, Leach, Perpetuities in Perspective: Ending the Rule’s Reign of Terror, 65 Harv L Rev 721, 736-737; see also, Leach, Perpetuities: New Absurdity, Judicial and Statutory Correctives, 73 Harv L Rev *650 1318, .1321-1322; Leach, Perpetuities in a Nutshell, 51 Harv L Rev 638, 660). Application of the rule to invalidate rights such as rights of first refusal has been found to defeat the legitimate expectations of the holder of the rights to the advantage of the other party who expressly agreed to the limitations (see, Weber v Texas Co., 83 F2d 807, 808-809, cert denied 299 US 561; Note, Survey, Developments in Maryland Law, 1987-1988: Property, 48 Md L Rev 749, 783-784). Thus, courts have recognized that the important commercial interests served by upholding preemptive rights, which only minimally affect alien-ability, outweigh the purpose underlying the rule against remote vesting (see, Metropolitan Transp. Auth. v Bruken Realty Corp., 67 NY2d 156, supra; see also, Anderson v 50 E. 72nd St. Condominium, 119 AD2d 73, 78, appeal dismissed 69 NY2d 743; Weber v Texas Co., 83 F2d 807, supra; Cambridge Co. v East Slope Inv. Corp., 700 P2d 537 [Colo]; Shiver v Benton, 251 Ga 284, 304 SE2d 903; Robroy Land Co. v Prather, 95 Wash 2d 66, 622 P2d 367; Hartnett v Jones, 629 P2d 1357 [Wyo]).
In Metropolitan Transp. Auth. v Bruken Realty Corp. (67 NY2d 156, supra), this Court acknowledged the contradiction of ancient purpose and modern application. We held the Rule against Perpetuities inapplicable to preemptive rights in commercial and governmental transactions, emphasizing that application of the rule "would invalidate an agreement which promoted the use and development of the property” (Metropolitan Transp. Auth. v Bruken Realty Corp., supra, at 166, 168). In Morrison v Piper (77 NY2d 165, supra), we addressed the applicability of the rule to preemptive rights in a noncommercial, family transaction involving residential property. We declined to extend the modern realism of Bruken to interests arising out of that family-land transaction, which had all the traditional touchstones envisioned by the original rule and purpose. Even so, we found an interpretative path, as the statute prescribes, to avoid invalidation of the transfer wherever possible (id., at 171-174). Thus, our Morrison decision should not be read to limit or otherwise affect the scope of the Bruken holding and exception concerning the Rule against Perpetuities in contemporary commercial settings.
In light of the history and purposes underlying the rule and the commercial and precedential context in which the Wildenstein/Wallis agreement arose, we conclude that the rule against remote vesting does not apply to these preemptive and exclusive consignment rights. The parties’ agreement, although factually in the borderland between the transactions *651 considered in Bruken and Morrison, is plainly closer to that in Bruken and qualifies for the commercial escape route from the rule expounded as part of Bruken’s rationale.
In exchange for helping Wallis regain a valued part of his collection, Wildenstein was assured that in the event of a sale of one or more of the paintings, it might still realize the profit or commission it hoped to earn when it originally acquired the Monet and the Gauguin. That the agreement also covered 13 other paintings does not alter our analysis, particularly because Wildenstein’s rights are triggered only by a decision to sell the paintings. Because Wildenstein must meet a third party’s offer if it elects to exercise its preemptive right, that right allows the Wallises, and their executors, successors or assigns, to realize the highest possible price should they decide to sell any of the paintings subject to the agreement. The agreement leaves the Wallises, and their executors, successors and assigns, free to maintain the paintings in the private collection or transfer them to a tax-exempt charitable organization — factual and interpretative matters not within the questions certified to us nor upon which we may rule or express any views.
Inasmuch as Wildenstein’s preemptive and exclusive consignment rights serve significant commercial interests by facilitating broader marketing of world-renowned art treasures while posing, at the most, only a minimal limitation on the alienability of the works, we conclude that they are not subject to the Rule against Perpetuities. Accordingly, the first certified question, as thus construed and applied, should be answered in the negative.
B.
Turning next to the second question certified, we address the validity of Wildenstein’s rights under the common-law rule against unreasonable restraints on alienation. We conclude that this doctrine does not invalidate Wildenstein’s rights under the agreement.
The reasonableness of Wildenstein’s preemptive first refusal rights and exclusive consignment rights depends upon their duration, price and purpose (see, Metropolitan Transp. Auth. v Bruken Realty Corp., 67 NY2d 156, 167, supra; Allen v Biltmore Tissue Corp., 2 NY2d 534, 542, supra). The rule condemns "not a restriction on transfer, a provision merely postponing sale during the option period, but an effective *652 prohibition against transferability itself’ (Allen v Biltmore Tissue Corp., supra, at 542 [emphasis in original]). Thus, the reasonableness of Wildenstein’s rights is determined by considering the 30-day period during which it could exercise its preemptive rights and the six-month period of its exclusive consignment right, not the remotely potential perpetual quality of those rights. We have upheld 90-day periods for exercising preemptive rights to purchase land (Metropolitan Transp. Auth. v Bruken Realty Corp., supra) and corporate stock (Allen v Biltmore Tissue Corp., supra). We note that the record contains an uncontradicted affidavit of an art gallery expert attesting to the widespread use of preemptive and exclusive consignment rights in the art world, and the unusually short duration of the six-month exclusive consignment rights in the Wildenstein/Wallis agreement.
The terms of Wildenstein’s first refusal right require it to meet the offer of a third party. Preemptive rights conditioned upon payment equal to a third party’s offer are generally reasonable; under this method of price determination, the owner suffers no legally cognizable loss (see, Metropolitan Transp. Auth. v Bruken Realty Corp., supra, at 167-168; 3 Simes and Smith, Future Interests § 1154, at 62-63 [2d ed]). The settlement agreement provides that should the Wallises wish to sell any of the paintings at auction, they may propose a price for the paintings. If the parties ultimately cannot agree as to a reasonable price, the agreement requires that the price be set by a major international auction house representative. This method of price setting, with input by Wildenstein, the Wallises and an independent third party, seems sensible and balanced. It ill behooves a court to substitute its sense of unreasonableness for the parties’ arm’s length agreement in the circumstances of a settlement of an essentially commercial dispute like the one in this case. Thus, given the reasonableness of the price, duration and purpose of Wildenstein’s first refusal and exclusive consignment rights, they should not be declared invalid under the common-law rule prohibiting unreasonable restrictions on the alienation of property.
Accordingly, the first and second questions certified, as construed and applied, should be answered in the negative and the third and fourth questions certified, concerning the alternative remedies that might be available in the event Wildenstein’s rights were deemed invalid under either of the *653 first two certified questions, should be not answered as unnecessary.