[631 NYS2d 136]

SYMPHONY SPACE, INC., Respondent, v PERGOLA PROPERTIES, INC., et al., Appellants.

First Department, August 31, 1995

## APPEARANCES OF COUNSEL

*Charles G. Moerdler* of counsel *(Burton N. Lipshie, Kenneth Pasquale* and *Karen Leo* on the brief; *Stroock & Stroock & Lavan,* and *Jaroslawicz & Jaros,* attorneys), for Pergola Properties, Inc. and another, appellants.

*Nathan M. Ferst* for Casandium Limited and another, appellants.

*Jean M. McCarroll* of counsel *(Carter, Ledyard & Milburn,* attorneys), for respondent.

## OPINION OF THE COURT

ELLERIN, J. P.

The issue before us in this declaratory judgment action is whether an agreement granting defendants an option to pur-

chase certain real property owned by plaintiff should be declared void as in violation of the Rule against Perpetuities and as clogging plaintiff's equity of redemption in its mortgage.

In 1978, representatives of plaintiff, The Symphony Space, Inc. (Symphony), a not-for-profit corporation engaged in presenting educational and artistic programs to the public and providing instruction and opportunities for emerging artists, approached Broadwest Realty Corporation (Broadwest) and expressed an interest in the use of a theater which was owned by Broadwest and which Symphony had previously rented for several one-night engagements. The two-story building containing the theater was located at 2527-2537 Broadway and covered most of the block on the west side of Broadway between 94th and 95th Streets with the exception of the southwest corner and, in addition to theater space, contained commercial space comprising a number of stores and offices. At that time, due to its inability to secure a permanent tenant for the theater (which comprised approximately 58% of the total square footage of the building's floor space)[1] while being required to pay taxes on the entire building, Broadwest had been operating the property at a net loss. (It may be noted that Broadwest also owned the contiguous three-story commercial building on the southern end of the lot known as the Healy Building and a residential complex known as Pomander Walk, which abutted the rear of the Broadway properties and ran between 94th and 95th Streets. These properties were not part of the proposed transaction.)

After negotiations, the parties agreed to a multipronged transaction involving the execution of several separate agreements, all dated December 31, 1978. These included a contract of sale whereby Symphony purchased the entire two-story building containing the theater for a purchase price of $10,000 by way of a purchase-money mortgage and note due on December 31, 2003. The purpose of the sale was to put Symphony, as a not-for-profit corporation, in a position to seek a property tax exemption for the building based on its use of that portion occupied by the theater, thereby substantially reducing the over-all real estate taxes on the building, which comprised a single tax parcel. As part of the transaction, Symphony also entered into a separate lease and agreement whereby it leased back all of the remaining commercial space

---

1. *See, Matter of Symphony Space v Tishelman,* 60 NY2d 33, 35, n 1.

to Broadwest for $1 per year plus the amount of the real estate taxes attributable to the commercial space. The trial court found that the leased space produced rental income of $140,000 annually. The lease was to extend until May 31, 2003, unless terminated earlier, and Broadwest was to continue to sublet that space to those lessees already in place in the stores, the longest of whose leases ran until 1987.

Symphony does not dispute that the $10,000 purchase price for the building did not reflect the real, much higher, market value of the property and that, essential to Broadwest's participation in the transaction, was the fact that in consideration of $10, the parties contemporaneously entered into the separate option agreement which is the subject of this appeal. Paragraph 3 of that agreement provided that Broadwest, or its successors and assigns, would have an option to buy back the property:

"(a) at any time after July 1, 1979, so long as the Notice of Election specifies that the Closing is to occur during any of the calendar years 1987, 1993, 1998, and 2003;

"(b) at any time following the maturity of the indebtedness evidenced by the Note and secured by the mortgage, whether by acceleration or otherwise;

"(c) during the ninety days immediately following any termination of the Lease by the lessor * * *

"(d) during the ninety days immediately following the thirtieth day after Broadwest shall have sent Symphony a notice specifying a default by Symphony of any of its covenants or obligations under the Mortgage".

Paragraph 4 of the option agreement set forth the price at which the property could be repurchased, varying from $15,000 in 1987 to $28,000 in 2003. It was also agreed that, if and when the option were exercised, Symphony would have a right of first refusal as to any lease or sale of the premises and that Broadwest would use its best efforts to include Symphony as a tenant in any structure built in place of the theater.

By entering into the transaction, Broadwest was able to retain the income from the nontheater commercial space and while it would remain liable for the existing $243,000 mortgage on the building and certain maintenance obligations, it would no longer be liable for the real estate taxes for the theater, which had been extremely burdensome for it in light of the theater's sporadic and unprofitable rental at that point in its history. In return, once Symphony received its tax

exemption (which it eventually did *[see, Matter of Symphony Space v Tishelman, supra]*), it would have the use of the theater in exchange for its minimal obligations under the purchase-money mortgage and note. The option agreement contemporaneously entered into served to further the ultimate goal of Broadwest, whose sole assets consisted of these properties and all of whose shares were owned by a trust with a number of elderly beneficiaries, which was to sell the entire property and distribute the proceeds. Thus, in addition to the significant immediate benefits which Broadwest received from the transaction, this arrangement would allow it to delay any ultimate sale of the property in the hope that property values would rise and until the commercial leases had expired in 1987, thereby increasing its value.

However, rather than waiting for expiration of the commercial leases, Broadwest, in the summer of 1981, transferred its entire interest in the mortgage, note, lease and option agreement, along with its ownership interests in the adjacent residential and commercial property, for the purchase price of $4,800,000, to defendants' nominee, which contemporaneously transferred it to the defendants herein as tenants in common.[2] Defendants subsequently sponsored a cooperative conversion of the residential apartment complex, Pomander Walk, which had since been designated a landmark. The value of the properties quickly increased and, according to defendants, even after the cooperative conversion of Pomander Walk and excluding whatever proceeds were derived by the defendants therefrom, the 1988 value of the full blockfront, including air rights transferred from Pomander Walk and assuming that the option were exercised, was $27 million. If the option agreement were unenforceable, the 1988 value of defendants' remaining interest in the property in issue was appraised at $5.5 million.

The events leading to the instant litigation commenced in January of 1985, when defendant Bradford N. Swett notified Symphony that, because of various alleged defaults under its mortgage, he, on behalf of the defendants, was declaring the note immediately due and electing to exercise the option pursuant to the provisions permitting its exercise upon a

---

2. While in their brief defendants state that the $4,800,000 purchase price was solely for Broadwest's interest in the mortgage, note, lease and option agreement, the record makes clear that the price also included Broadwest's fee simple interests in the contiguous Healy and Pomander Walk buildings.

mortgage default by Symphony. According to defendants, Swett had acted because Symphony had failed to make payments required by the mortgage. The closing was set for May 6, 1985.

According to Symphony, it believed that it was not in default and that this attempt to exercise the option was improper, and, moreover, suspected that Swett's purported exercise of the option on behalf of all the defendants was without authority and that, in fact, he was acting alone. To address these concerns, Symphony turned to its counsel, who, upon reexamining the option agreement, informed Symphony of his belief that the agreement was invalid both under the Rule against Perpetuities and as clogging Symphony's equity of redemption in the mortgage. As a result, in March 1985, Symphony instituted this action to have the option agreement declared void.

Although defendant Pergola Properties, Inc. (Pergola) now contends that Swett had acted on its behalf in his original attempt to exercise the option, the record makes clear to the contrary that, on April 4, 1985, Pergola provided Symphony with separate notice of default informing Symphony that Swett had not acted on its behalf but that, because Symphony had initiated this lawsuit, Pergola was exercising the option on behalf of all the defendants pursuant to the mortgage default provisions and it was setting a closing date of July 10, 1985. Pergola further indicated that, in the alternative, it was exercising the option pursuant to paragraph 3 (a), the "at will" provision, which allowed exercise of the option at certain points of time regardless of Symphony's compliance with its obligations under the mortgage, and was noticing that closing for January 5, 1987, 1987 being the first available year for exercise of the option under such paragraph. Symphony did not appear at the May 1985, July 1985, or January 1987 closings.

Subsequently, the internecine dispute among the defendants concerning control and management of the property having resulted in litigation among them, defendant Pergola, in March 1987, advised Symphony that the Supreme Court in that separate litigation had authorized it to exercise the option on behalf of all of the defendants and it was doing so pursuant to the "at will" paragraph and scheduling the closing for September 11, 1987. Two weeks after Pergola issued that notice, Swett informed Symphony that the judgment authorizing Pergola to exercise the option on behalf of all the

defendants had been stayed. Symphony again did not appear at the scheduled closing.

According to Symphony, as soon as this series of events commenced with Swett's notice in 1985 and up until the decision by the IAS Court in this case, the defendants "systematically emptied the commercial units and increasingly neglected their maintenance obligations under the lease," causing the commercial space to deteriorate from a productive community resource to a vacant and dilapidated blight on the neighborhood and resulting in various unacceptable conditions for the theater as well, including a nonfunctioning boiler, unsealed holes in exterior walls, sewage backup, and placement of a lock on the theater's second means of egress.

Subsequently, the parties cross-moved for summary judgment in this action and the IAS Court, in the order which is the subject of this appeal, granted plaintiff's motion for summary judgment declaring the agreement void and dismissed a number of defendants' counterclaims, including defendant Pergola's counterclaim for rescission.

■ The threshold issue before us is whether the instant option agreement is in violation of the Rule against Perpetuities and therefore void.

The current New York Rule against Perpetuities is codified at EPTL 9-1.1, which was enacted in 1966. It rigidly limits the ability of owners to control future dispositions of their property with respect to both the suspension of alienation (subd [a]) and the remote vesting of property (subd [b]). In addition, even interests which do not offend the strictures of the statute may be limited by the common-law prohibition against unreasonable restraints on alienation, which is a somewhat more flexible standard. *(See, Wildenstein & Co. v Wallis,* 79 NY2d 641, 651-652.)

In this case, plaintiff's claim is based on the statutory rule against remote vesting, which provides that "[n]o estate in property shall be valid unless it must vest, if at all, not later than twenty-one years after one or more lives in being at the creation of the estate" (EPTL 9-1.1 [b]). Where, as here, the only parties to the transaction are corporations and no measuring life or lives are referred to in the instruments, the time period in which an estate must vest is 21 years from its creation *(Metropolitan Transp. Auth. v Bruken Realty Corp.,* 67 NY2d 156, 161).

There can be no dispute that the options provided for in the

option agreement could vest more than 21 years after execution of the agreement, and, as written, would extend beyond the permissible period set forth in the statute. It is argued, however, that because the option agreement was part of a multifaceted commercial transaction, including a lease back of part of the property, the rule should not apply to frustrate the clearly expressed intent of the parties in this sophisticated business arrangement.

Our analysis begins with reference to the purpose underlying the rule against remote vesting and the other related rules limiting the right of indefinite control over property which is to "ensure the productive use and development of property by its current beneficial owners by simplifying ownership, facilitating exchange and freeing property from unknown or embarrassing impediments to alienability" *(supra,* at 161, citing *De Peyster v Michael,* 6 NY 467, 494). Since the purpose of the rule is the furtherance of a social policy, i.e., the free and ready transfer of property, a court's object in applying the rule to void an interest is to defeat, rather than carry out, the parties' intent *(Matter of Kellogg,* 35 AD2d 145, 148). In other words, the intent of the parties must be deemed subordinate to the policy goals sought to be achieved by preventing impermissible restraints upon the transferability of property.

In *Buffalo Seminary v McCarthy* (58 NY2d 867, *affg for reasons stated in Parts I and II of opn at* 86 AD2d 435) the Court of Appeals held that whatever the rule may have been previously, the rule against remote vesting in the present statute will be applied to invalidate an option to purchase real property if it is exercisable beyond the statutory period. The option in that case arose in the context of a private transaction involving two adjoining landowners.

Subsequently, in *Metropolitan Transp. Auth. v Bruken Realty Corp. (supra),* the Court carved out an exception to the rule against remote vesting for certain preemptive rights, i.e., rights of first refusal. The Court emphasized the significant distinctions between an option, which grants to the holder the power to compel the owner of property to sell whether the owner is willing to part with ownership or not, and a preemptive right, or right of first refusal, which does not give the holder the power to compel an unwilling owner to sell but, rather, gives the right to purchase only upon the owner's decision to sell at a price agreeable to the owner. Reiterating its prior holding in *Buffalo Seminary v McCarthy (supra),* that

options are subject to the rule against remote vesting, the Court in *Bruken* framed the question before it in terms of whether the preemptive right there in issue, involving a commercial and governmental transaction, should similarly be made subject to the rule.

In concluding that the preemptive right should be excepted from the rule, the Court found that although preemptive rights of unlimited duration do violate the rule against remote vesting they do so only marginally, a factor which is offset by the fact that application of the rule, because of its inflexibility, may operate to invalidate legitimate commercial and governmental activities to which "lives in being" or "twenty-one years" have little relevance and that strict application of the rule in this instance would defeat the very policies underlying the rule because it would invalidate an agreement which promoted the use and development of the property while, at the same time, imposing only a minor impediment to free transferability *(Metropolitan Transp. Auth. v Bruken Realty Corp., supra,* at 166).

The reluctance of the Court to broadly apply "the *Bruken* exception" was made clear by its subsequent holding in *Morrison v Piper* (77 NY2d 165, 171) that the exception would not be extended to a right of first refusal in "private, noncommercial transactions between individuals in which there is no governmental or public interest", the right there arising in a family transaction involving residential property, "which had all the traditional touchstones envisioned by the original rule and purpose" *(Wildenstein & Co. v Wallis,* 79 NY2d, *supra,* at 650).

In *Wildenstein & Co. v Wallis (supra),* the Court was presented with the issue of whether the Rule against Perpetuities should apply to preemptive rights and future exclusive consignment rights with respect to valuable and well-known works of art. While noting that the Court had held "the rule applicable to options in real estate transactions" *(supra,* at 648), Judge Bellacosa pointed to the recognition accorded by courts to serving important commercial interests by upholding preemptive rights which only minimally affect alienability by excepting those rights from the rule against remote vesting *(supra,* at 649-650). While finding that the agreement before it fell factually in the borderland between the transactions in *Bruken* and *Morrison,* the Court found that it was closer to that in *Bruken* and qualified "for the commercial escape route from the rule" *(supra,* at 651). In so finding it was stressed

that "Wildenstein's preemptive and exclusive consignment rights serve significant commercial interests by facilitating broader marketing of world-renowned art treasures while posing, at the most, only a minimal limitation on the alienability of the works" *(supra,* at 651).

Defendants do not deny that under the current state of the law in New York, independent options for the purchase of property are subject to the statutory rule against remote vesting. They argue, however, that the exception made in *Bruken* and *Wildenstein* for preemptive rights in a commercial setting should be extended to the option agreement in this case which was given as an essential part of a multifaceted commercial transaction that also included a long-term leasehold to the sellers of part of the property and which arrangement resulted in plaintiff purchaser being provided with substantial theater space for its public service activities virtually cost free.

While defendants stress the references to commercial transactions in *Bruken* and *Wildenstein* as the touchstone of the ultimate holdings in those cases, they ignore the fact that inextricably intertwined with such factor is the nature of the property interests involved—i.e., rights of first refusal—which have a marginal impact upon remote vesting in distinction to the direct impact that options have in inhibiting the free transferability of property and the express statutory proscription against the undue continuation of such fetter upon property as a matter of public policy. *(Metropolitan Transp. Auth. v Bruken Realty Corp., supra; Buffalo Seminary v McCarthy, supra.)* Also significant is the Court's careful scrutiny in each case of the precise factual setting in which the preemptive right was to be exercised and the impact of its exercise on the underlying purpose of the rule against remote vesting which is to insure the productive use and development of property by its current beneficial owner. It was only upon concluding that such purpose would be met in each case that the Court excepted the preemptive rights in *Bruken* and *Wildenstein* from the rule, also making reference to the broader societal benefits that would inure from upholding those preemptive rights.

The relevance of the Rule against Perpetuities to modern commercial transactions has been seriously questioned and criticized as of " 'doubtful wisdom' " by respected legal commentators *(see, Wildenstein & Co. v Wallis, supra,* at 649; *and, particularly,* Leach, *Perpetuities in Perspective: Ending the*

*Rule's Reign of Terror,* 65 Harv L Rev 721) and, indeed, the rule is a very harsh and inflexible one that will invalidate business transactions bargained for in good faith because they exceed the specified time limitation even though such time frame is not necessarily germane or relevant in a commercial context. Nevertheless the statutory proscription is clear and unambiguous and delineates the public policy to be followed in this State. The Court of Appeals has consistently indicated that options, in distinction to preemptive rights, are subject to the rule in accordance with its holding in *Buffalo Seminary* and when carving out a limited exception for preemptive rights of first refusal it has done so only in carefully circumscribed circumstances where the upholding of the right would promote the use and development of the property.

A factual analysis of the option in this case, in the context of the purpose underlying the statutory stricture, demonstrates the difference in impact that such option has in distinction to a preemptive right. In the case of a preemptive right, neither the decision to sell the property nor the amount of the ultimate price to be paid are within the control of the holder of the right thereby encouraging the current beneficial owner to improve and enhance the value of the property. *(See, Metropolitan Transp. Auth. v Bruken Realty Corp., supra; Wildenstein & Co. v Wallis, supra.)* In distinction, in the case of the option before us, it is the holder who would determine when the sale takes place and at a predetermined token price, wholly unrelated to the value of the property. This would clearly eliminate any incentive to invest money to properly maintain or upgrade the property by the current owner, even if Symphony were financially in a position to do so. Moreover, not only would the consequences of such option prevent Symphony from obtaining any financing to improve the property but any attempt by it to sell the property would necessarily be severely impaired because of the absolute restraint imposed by the meagerly priced option, in distinction to the minimal restraint on alienability imposed by rights of first refusal. *(Anderson v 50 E. 72nd St. Condominium,* 119 AD2d 73, *appeal dismissed* 69 NY2d 743.) Moreover, the existence of the option agreement not only inhibited Symphony, as the owner, from seeking to make capital improvements to the property, but the leaseback of only a portion of the premises to the original seller and holder of the option, under the circumstances of this transaction, also discouraged the lessee from developing the property since independent development of the

commercial space separate from the theater space was not feasible. As a result, defendants had no incentive to improve any part of the property prior to an exercise of the option (which would be guided by appreciating real estate market forces) and, instead, ignored their maintenance obligations and permitted the property to fall into disrepair.

Notwithstanding the foregoing, defendants argue that precisely because they are lessees of a portion of the property, the option agreement is not subject to the rule. While there is a reference in *Buffalo Seminary v McCarthy (supra,* at 441, n 5) to options appurtenant to leases not being subject to the rule, the agreement before us does not fall within that category. In the above-cited footnote, Justice Hancock, as he then was, in defining an independent option, stated that "[t]he important point with regard to this issue [i.e., whether the option violates the rule against remoteness in vesting] is that the option is not part of a lease." *(Supra,* at 441, n 5.) While the various agreements here in issue are part of an over-all transaction, they are all separate instruments and paragraph 5 of the option agreement expressly states that *"the option granted hereby is * * * unconditional and shall not in any way be affected or impaired by Broadwest's performance or nonperformance,* actual or asserted, *of any obligation to be performed under the Lease* or any other agreement or instrument by or between Broadwest and Symphony" (emphasis added). The lease itself makes no mention at all of the option agreement and the lease term extends from January 1, 1979 to May 31, 2003, while exercise of the various alternatives in the option agreement either expressly extend beyond that period or can be construed to do so and, in no event, are any of those alternatives coterminous with the lease period.

The authorities cited by Justice Hancock make clear that an "option appendant" (which would not be subject to the rule against remote vesting) must originate in one of the provisions of a lease, its duration must be coextensive with that of the lease in which it appears, it must be incapable of separation from the lease and may not be exercisable after the expiration of the lease. (Berg, *Long-Term Options and the Rule Against Perpetuities,* 37 Cal L Rev 1, 21; Simes & Smith, Law of Future Interests § 1244, at 162 [2d ed]; *see also, Warren St. Assocs. v City Hall Tower Corp.,* 202 AD2d 200.) The option agreement here in no way meets those criteria. Instead, it constitutes an "option in gross" which does not originate in a lease (Berg, *op. cit.,* at 21) and is, therefore, covered by the

rule against remote vesting. It should be noted, moreover, that the reason for the exclusion of an option appurtenant to a lease from that rule is because ordinarily the holder in such case would be "encouraged * * * to develop the property by insuring his opportunity to benefit from development and to recapture his investment in it." *(Metropolitan Transp. Auth. v Bruken Realty Corp., supra,* at 165.)* As has been indicated, in this case, the nature of the separate and independent partial lease agreement, although permitting the lessee to continue to enjoy the substantial tax benefits pending its exercise of the option, has also served to discourage the development and productive utilization of that part of the property while development of the owner-occupied space has been simultaneously inhibited by the existence of the long-term option agreement. It is clear, therefore, that the entire arrangement here has served to frustrate, rather than promote, the purpose and policies underlying the statutory rule, in sharp distinction to the situations in the cases relied upon by defendants where the preemptive rights furthered the purpose of the rule.

In the final analysis, defendants' argument that the option here in issue should be excepted from the statute is really unrelated to any policy underlying the rule but is posited on the ground that this is an agreement involving a commercial transaction which fully reflected the intent of both parties and should be effectuated. Defendants emphasize that their predecessor in interest would never have entered into the sale without the belief that the option, which constituted a major part of the consideration for the transfer, would be enforced, that the transaction was eagerly entered into by both parties for their mutual commercial benefit and that everything about the transaction demonstrates that it was intended to be a temporary transfer of the property.

However, since the statutory Rule against Perpetuities is a rule of policy and not of construction, the intent of the parties is not relevant. The very purpose of the rule is to defeat or thwart an intent of a grantor to create an unreasonably long restriction upon the use or marketability of the property involved. *(See, Matter of Kellogg,* 35 AD2d 145, 148, *supra.)* Moreover, while commercial usefulness was an important factor to the *Bruken* Court, it was only considered significant if the nature of the interest did not frustrate the underlying purpose of the statute. Thus, that the transaction here was meant to be commercially beneficial for both parties, that it was structured for tax purposes, or that similar transactions

are common and commercially useful, cannot be used as a basis to ignore or overrule the statutorily imposed time limitation.

As an alternative argument to completely exempting the option agreement from the rule, defendants suggest that the option agreement be modified to excise that portion which permits exercise of the option outside the perpetuities period. While this would appear to be a reasonable approach that would substantially implement the intent manifested by the parties when the transaction was entered into while not transgressing the statutory limitation, that avenue is foreclosed by the very language of the statute. EPTL 9-1.1 (b) provides that no estate in property shall be valid unless it must vest, if at all, not later than 21 years (in the case of a corporation) after the creation of the estate and the validity of the provision must be judged by the circumstances existing at the time of the grant. *(Metropolitan Transp. Auth. v Bruken Realty Corp., supra; Matter of Grace,* 232 App Div 76, 79-80, *affd* 261 NY 502.)* "It is void from the beginning if it *could* vest too remotely" (Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 9-1.1, at 481 [emphasis added]) and the statute does not permit a court to rewrite a transfer to limit the time within which the interest transferred must vest to fit it within the perpetuities period *(Buffalo Seminary v McCarthy,* 86 AD2d 435, 446, *affd* 58 NY2d 867, *supra; Warren St. Assocs. v City Hall Tower Corp.,* 202 AD2d 200, *supra).*

It may be noted that some jurisdictions have adopted a "wait and see" policy which essentially dictates that what actually happens during the perpetuities period applicable to the particular interest determines the validity of the interest *(see,* Dukeminier, *A Modern Guide to Perpetuities,* 74 Cal L Rev 1867, 1876). This may well be the more desirable path to follow, particularly in the case of options in a commercial context such as that here in issue. Obviously under that theory the current attempt to exercise the option, which would fall within the permissible 21-year period, would not violate the rule. To date, however, that is not the position which prevails in this State which instead applies the "what might have been" doctrine. That doctrine views events as of the time the disposition is made and the situation is evaluated in terms of what could happen from that time forward irrespective of what has actually happened since that time. *(See, Matter of Friend,* 283 NY 200, 206; *Matter of Kellogg, supra;*

Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 9-1.1, at 481.)

In light of our decision that the option agreement is void under the rule against remote vesting, we need not reach plaintiff's independent argument that the agreement as a whole is also invalid as clogging its equity of redemption in the mortgage.

■ The final issue before us is whether, as defendants contend, the original contract of sale under which Symphony purchased the subject property from Broadwest should be rescinded because of the mutual mistake of the parties, neither of whom were aware of the effect of the rule against remote vesting on the related option agreement when they entered into the sale and because the option agreement was crucial to the entire transaction.

While we are in agreement with the IAS Court that questions of fact remain as to whether Broadwest's claim for rescission was properly assigned to defendant Pergola, we also agree that rescission must be denied regardless of the validity of the assignment.

The courts will impose the equitable remedy of rescission to a contract which does not reflect the parties' intent because of their mutual mistake where it is warranted in the interest of justice and fairness (*D'Antoni v Goff,* 52 AD2d 973, 974). Its effect is "to declare the contract void from its inception and to put or restore the parties to *status quo"* (*Schwartz v National Computer Corp.,* 42 AD2d 123, 125).

While no New York case on point has been cited, there would appear to be an irreconcilable conflict in applying a remedy which is designed to void a transaction because it fails to carry out the parties' true intent to a transaction in which the mistake made by the parties was the application of the Rule against Perpetuities, the purpose of which is to defeat the intent of the parties, rather than carry it out (*Matter of Kellogg,* 35 AD2d, *supra,* at 148). Defendants contend that rescission would be appropriate in this case, since it is the underlying sale which they seek to rescind, not the offending option agreement itself. However, this would merely be an attempt to use equity to defeat the purpose of the statute, that is, by rescission to permit the very result which the statute prohibits. Analogy may be made in this context to the long-standing rule that no damages may be sought for refusal to perform an option which is void under the Rule against

Perpetuities, since to allow damages in such a situation "would significantly tend to compel performance of the contract" and "effectuation of the purpose of the rule against perpetuities requires that no recovery of damages be permitted in such case". (4 Restatement of Property § 393, comment *h.*) The spectre of possible rescission would, like the spectre of damages, in many cases make refusal to perform the void option undesirable. Such a policy would honor the words of the statute while frustrating its desired effect, i.e., discouraging the parties to real property transactions from creating or accepting excessively long encumbrances.

Moreover, in considering the equities in this case, a matter of great significance in any determination as to whether rescission is warranted, the seeming unfairness of the plaintiff's retention of the ownership of the property for the original purchase price of $10,000 must be evaluated in the context of the other factors which motivated the transaction. It must be emphasized that the option agreement was by no means the sole consideration for Broadwest's entering into the sale. On the contrary, the immediate and very substantial tax benefits which inured to Broadwest, the original owner, by virtue of the sale and lease back, for $1 annually, of all the commercial space in the building, was also of critical, and perhaps paramount, importance to its participation in the arrangement. By doing so, Broadwest was able to divest itself of the ownership of real estate that was operating at a loss while continuing to receive the income from the commercial rentals that were now rendered profitable because of the tax consequences stemming from plaintiff's ownership of the property due to its "charitable activities" status. The significant value of the leasehold in that setting was demonstrated by the very substantial profit realized by Broadwest upon the sale of its various interests in the property to defendants' nominee and the appraisal evidence in the record that even if the option agreement were unenforceable, the 1988 value of defendants' remaining interest in the property would be $5.5 million.

To now, as defendants urge, rescind the sale and return the parties to the status quo is neither possible nor consonant with equitable principles in light of the benefits and tax consequences which have flowed to all of the parties by reason of plaintiff's ownership of the property. Implicit in defendants' assertions that this was a "temporary passing of title" and intended to be "a limited conveyance—both as to substance

and term" is the intimation that it was entered into for purposes of misleading the tax authorities so that the ostensible seller might benefit. This is hardly a firm foundation on which to invoke equitable intervention for purposes of enabling defendants to further gain from what is now characterized as not intended to be a real sale but merely the passing of "formal title".

Nor is defendants' equitable position enhanced by the facts that during the period of its ownership Symphony has utilized the property for constructive purposes inuring to the public good and made a positive contribution to the neighborhood while defendants have done nothing to enhance the property or its value to the neighborhood, other than allowing it to deteriorate, and that any increase in the property's value has been in spite of, rather than because of, their efforts or interest in the property.

For all of the foregoing reasons, we find that rescission is warranted neither by the law nor the facts in this case.

Order, Supreme Court, New York County (Diane Lebedeff, J.), entered April 21, 1994, which, *inter alia,* granted plaintiff's cross motion for summary judgment declaring the parties' option agreement void and dismissing the counterclaim of defendant Pergola Properties, Inc. for rescission, unanimously affirmed, without costs.

KUPFERMAN, J. (dissenting). While the majority opinion sets forth the background, albeit somewhat skewed toward the plaintiff's position, there is no reason to cavil inasmuch as there is really only one issue of consequence and that is whether the option agreement violates the Rule against Perpetuities.

In its most recent pronouncement the Court of Appeals *(Wildenstein & Co. v Wallis,* 79 NY2d 641) made it clear that in a modern commercial setting the rule has little significance.

What we have here is a tax gimmick transaction beneficial to both sides. The plaintiff got a theater with tax exemption *(Matter of Symphony Space v Tishelman,* 60 NY2d 33) and the defendants found a way to keep a tie on the property at little overhead expense waiting for the pot of gold at the end of the rainbow to materialize. Now that the pot is about to boil over, the plaintiff tries to void the bargain it made.

It is not for us to manufacture a reason to keep a worthwhile community project from ending. The show had a solid

run and it was contemplated that the curtain would come down.

ASCH and RUBIN, JJ., concur with ELLERIN, J.; KUPFERMAN, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered April 21, 1994, affirmed, without costs.