*471
 
 OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This case presents the novel question whether options to purchase commercial property are exempt from the prohibition against remote vesting embodied in New York’s Rule against Perpetuities (EPTL 9-1.1 [b]). Because an exception for commercial options finds no support in our law, we decline to exempt all commercial option agreements from the statutory Rule against Perpetuities.
 

 Here, we agree with the trial court and Appellate Division that the option defendants seek to enforce violates the statutory prohibition against remote vesting and is therefore unenforceable.
 

 I. FACTS
 

 The subject of this proceeding is a two-story building situated on the Broadway block between 94th and 95th Streets on Manhattan’s Upper West Side. In 1978, Broadwest Realty Corporation owned this building, which housed a theater and commercial space. Broadwest had been unable to secure a permanent tenant for the theater — approximately 58% of the total square footage of the building’s floor space
 
 (see, Matter of Symphony Space v Tishelman,
 
 60 NY2d 33, 35, n 1). Broadwest also owned two adjacent properties, Pomander Walk (a residential complex) and the Healy Building (a commercial building). Broadwest had been operating its properties at a net loss.
 

 Plaintiff Symphony Space, Inc., a not-for-profit entity devoted to the arts, had previously rented the theater for several one-night engagements. In 1978, Symphony and Broadwest engaged in a transaction whereby Broadwest sold the entire building to Symphony for the below-market price of $10,010 and leased back the income-producing commercial property, excluding the theater, for $1 per year. Broadwest maintained liability for the existing $243,000 mortgage on the property as well as certain maintenance obligations. As a condition of the sale, Symphony, for consideration of $10, also granted Broadwest an option to repurchase the entire building. Notably, the transaction did not involve Pomander Walk or the Healy Building.
 

 The purpose of this arrangement was to enable Symphony, as a not-for-profit corporation, to seek a property tax exemption for the entire building — which constituted a single tax parcel — predicated on its use of the theater. The sale-and-leaseback would thereby reduce Broadwest’s real estate taxes
 
 *472
 
 by $30,000 per year, while permitting Broadwest to retain the rental income from the leased commercial space in the building, which the trial court found produced $140,000 annually. The arrangement also furthered Broadwest’s goal of selling all the properties, by allowing Broadwest to postpone any sale until property values in the area increased and until the commercial leases expired. Symphony, in turn, would have use of the theater at minimal cost, once it received a tax exemption.
 

 Thus, on December 1, 1978, Symphony and Broadwest — both sides represented by counsel — executed a contract for sale of the property from Broadwest to Symphony for the purchase price of $10,010. The contract specified that $10 was to be paid at the closing and $10,000 was to be paid by means of a purchase-money mortgage.
 

 The parties also signed several separate documents, each dated December 31, 1978: (1) a deed for the property from Broadwest to Symphony; (2) a lease from Symphony to Broad-west of the entire building except the theater for rent of $1 per year and for the term January 1, 1979 to May 31, 2003, unless terminated earlier; (3) a 25-year, $10,000 mortgage and mortgage note from Symphony as mortgagor to Broadwest as mortgagee, with full payment due on December 31, 2003; and (4) an option agreement by which Broadwest obtained from Symphony the exclusive right to repurchase all of the property, including the theater.
 

 It is the option agreement that is at the heart of the present dispute. Section 3 of that agreement provides that Broadwest may exercise its option to purchase the property during any of the following "Exercise Periods”:
 

 "(a) at any time after July 1, 1979, so long as the Notice of Election specifies that the Closing is to occur during any of the calendar years 1987, 1993, 1998 and 2003;
 

 "(b) at any time following the maturity of the indebtedness evidenced by the Note and secured by the Mortgage, whether by acceleration or otherwise;
 

 "(c) during the ninety days immediately following any termination of the Lease by the lessor thereof other than for nonpayment of rent or any termination of the Lease by the lessee thereof * * *
 

 "(d) during the ninety days immediately following
 
 *473
 
 the thirtieth day after Broadwest shall have sent Symphony a notice specifying a default by Symphony of any of its covenants or obligations under the Mortgage.”
 

 Section 1 states that "Broadwest may exercise its option at any time during any Exercise Period.” That section further specifies that the notice of election must be sent at least 180 days prior to the closing date if the option is exercised pursuant to section 3 (a) and at least 90 days prior to the closing date if exercised pursuant to any other subdivision.
 

 The following purchase prices of the property, contingent upon the closing date, are set forth in section 4: $15,000 if the closing date is on or before December 31, 1987; $20,000 if on or before December 31, 1993; $24,000 if on or before December 31, 1998; and $28,000 if on or before December 31, 2003.
 

 Importantly, the option agreement specifies in section 5 that "Broadwest’s right to exercise the option granted hereby is * * * unconditional and shall not be in any way affected or impaired by Broadwest’s performance or nonperformance, actual or asserted, of any obligation to be performed under the Lease or any other agreement or instrument by or between Broadwest and Symphony,” other than that Broadwest was required to pay Symphony any unpaid rent on the closing date. Finally, section 6 established that the option constituted "a covenant running with the land, inuring to the benefit of heirs, successors and assigns of Broadwest.”
 

 Symphony ultimately obtained a tax exemption for the theater. In the summer of 1981, Broadwest sold and assigned its interest under the lease, option agreement, mortgage and mortgage note, as well as its ownership interest in the contiguous Pomander Walk and Healy Building, to defendants’ nominee for $4.8 million. The nominee contemporaneously transferred its rights under these agreements to defendants Pergola Properties, Inc., Bradford N. Swett, Casandium Limited and Darenth Consultants as tenants in common.
 

 Subsequently, defendants initiated a cooperative conversion of Pomander Walk, which was designated a landmark in 1982, and the value of the properties increased substantially. An August 1988 appraisal of the entire blockfront, including the Healy Building and the unused air and other development rights available from Pomander Walk, valued the property at $27 million assuming the enforceability of the option. By contrast, the value of the leasehold interest plus the Healy Building without the option were appraised at $5.5 million.
 

 
 *474
 
 Due to Symphony’s alleged default on the mortgage note, defendant Swett served Symphony with notice in January 1985 that it was exercising the option on behalf of all defendants. The notice set a closing date of May 6, 1985. Symphony, however, disputed both that it was in default and Swett’s authority to exercise the option for all of the defendants. According to Symphony, moreover, it then discovered that the option agreement was possibly invalid. Consequently, in March 1985, Symphony initiated this declaratory judgment action against defendants, arguing that the option agreement violated the New York statutory prohibition against remote vesting and clogged its equity of redemption under the mortgage.
 

 Defendant Pergola subsequently served Symphony with separate notice of default dated April 4,1985, informing Symphony that it was exercising the option on behalf of all defendants pursuant to sections 1, 3 (b) and 3 (d) of the option agreement and setting the closing date for July 10, 1985. Pergola further notified Symphony that it was alternatively exercising the option under section 3 (a) of the option agreement, which was not contingent upon Symphony’s default, with the closing date scheduled for January 5, 1987. Symphony did not appear for any of the closing dates contained in Swett’s or Pergola’s notices.
 

 A dispute among the defendants over Swett’s authority to serve the initial notice developed into a separate litigation, culminating in the trial court authorizing Pergola to exercise the option on behalf of all defendants. In March 1987, Pergola thus served Symphony with another notice that it was exercising the option pursuant to section 3 (a), with the closing scheduled for September 11, 1987. The trial court’s judgment was stayed, however, and Symphony did not appear at the March closing.
 

 Thereafter, the parties cross-moved for summary judgment in the instant declaratory judgment proceeding. The trial court granted Symphony’s motion while denying that of defendants. In particular, the court concluded that the Rule against Perpetuities applied to the commercial option contained in the parties’ agreement, that the option violated the Rule and that Symphony was entitled to exercise its equitable right to redeem the mortgage. The trial court also dismissed defendants’ counterclaim for rescission of the agreements underlying the transaction based on the parties’ mutual mistake.
 

 In a comprehensive writing by Justice Ellerin, the Appellate Division likewise determined that the commercial option was
 
 *475
 
 unenforceable under the Rule against Perpetuities and that rescission was inappropriate. The Appellate Division certified the following question to us: "Was the order of the Supreme Court, as affirmed by this Court, properly made?” We conclude that it was and now affirm.
 

 II. STATUTORY BACKGROUND
 

 The Rule against Perpetuities evolved from judicial efforts during the 17th century to limit control of title to real property by the dead hand of landowners reaching into future generations. Underlying both early and modern rules restricting future dispositions of property is the principle that it is socially undesirable for property to be inalienable for an unreasonable period of time. These rules thus seek "to ensure the productive use and development of property by its current beneficial owners by simplifying ownership, facilitating exchange and freeing property from unknown or embarrassing impediments to alienability”
 
 (Metropolitan Transp. Auth. v Bruken Realty Corp.,
 
 67 NY2d 156, 161, citing
 
 De Peyster v Michael,
 
 6 NY 467, 494).
 

 The traditional statement of the common-law Rule against Perpetuities was set forth by Professor John Chipman Gray: "No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest” (Gray, The Rule Against Perpetuities § 201, at 191 [4th ed 1942]).
 

 In New York, the rules regarding suspension of the power of alienation and remoteness in vesting — the Rule against Perpetuities — have been statutory since 1830. Prior to 1958, the perpetuities period was two lives in being plus actual periods of minority
 
 (see,
 
 Real Property Law former § 42). Widely criticized as unduly complex and restrictive, the statutory period was revised in 1958 and 1960, restoring the common-law period of lives in being plus 21 years
 
 (see,
 
 L 1958, ch 153; L 1960, ch 448).
 

 Formerly, the rule against remote vesting in New York was narrower than the common-law rule, encompassing only particular interests
 
 (see,
 
 Real Property Law former §§ 46, 50;
 
 Buffalo Seminary v McCarthy,
 
 86 AD2d 435, 440,
 
 affd
 
 58 NY2d 867). A further 1965 amendment enacted a broad prohibition against remote vesting
 
 (see,
 
 L 1965, ch 670, § 1). This amendment was intended to make clear that the American common-law rule of perpetuities was now fully in force in New York
 
 (see,
 
 1965 NY Legis Ann, at 206-207).
 

 
 *476
 
 New York’s current statutory Rule against Perpetuities is found in EPTL 9-1.1. Subdivision (a) sets forth the suspension of alienation rule and deems void any estate in which the conveying instrument suspends the absolute power of alienation for longer than lives in being at the creation of the estate plus 21 years (see, EPTL 9-1.1 [a] [2]). The prohibition against remote vesting is contained in subdivision (b), which states that "[n]o estate in property shall be valid unless it must vest, if at all, not later than twenty-one years after one or more lives in being at the creation of the estate and any period of gestation involved” (EPTL 9-1.1 [b]). This Court has described subdivision (b) as "a rigid formula that invalidates any interest that may not vest within the prescribed time period” and has "capricious consequences”
 
 (Wildenstein & Co. v Wallis,
 
 79 NY2d 641, 647-648). Indeed, these rules are predicated upon the public policy of the State and constitute nonwaivable, legal prohibitions
 
 (see, Metropolitan Transp. Auth. v Bruken Realty Corp.,
 
 67 NY2d at 161).
 

 In addition to these statutory formulas, New York also retains the more flexible common-law rule against unreasonable restraints on alienation. Unlike the statutory Rule against Perpetuities, which is measured exclusively by the passage of time, the common-law rule evaluates the reasonableness of the restraint based on its duration, purpose and designated method for fixing the purchase price.
 
 (See, Wildenstein & Co. v Wallis,
 
 79 NY2d at 648;
 
 Metropolitan Transp. Auth. v Bruken Realty Corp.,
 
 67 NY2d at 161-162,
 
 supra)
 

 Against this background, we consider the option agreement at issue.
 

 III. VALIDITY OF THE OPTION AGREEMENT
 

 Defendants proffer three grounds for upholding the option: that the statutory prohibition against remote vesting does not apply to commercial options; that the option here cannot be exercised beyond the statutory period; and that this Court should adopt the "wait and see” approach to the Rule against Perpetuities. We consider each in turn.
 

 A. Applicability of the Rule to Commercial Options
 

 Under the common law, options to purchase land are subject to the rule against remote vesting
 
 (see,
 
 Simes, Future Interests § 132 [2d ed 1966]; Simes and Smith, Future Interests § 1244 [2d ed]; Leach,
 
 Perpetuities in a Nutshell,
 
 51 Harv L Rev 638, 660;
 
 see also, London & S. W. Ry. Co. v Gomm,
 
 20 Ch D 562).
 
 *477
 
 Such options are specifically enforceable and give the option holder a contingent, equitable interest in the land (Dukeminier,
 
 A Modem Guide to Perpetuities,
 
 74 Cal L Rev 1867, 1908; Leach,
 
 Perpetuities in Perspective: Ending the Rule’s Reign of Terror,
 
 65 Harv L Rev 721, 736-737). This creates a disincentive for the landowner to develop the property and hinders its alienability, thereby defeating the policy objectives underlying the Rule against Perpetuities
 
 (see,
 
 Dukeminier, A
 
 Modern Guide to Perpetuities,
 
 74 Cal L Rev 1908; 5A Powell, Real Property ¶ 771 [1]).
 

 Typically, however, options to purchase are part of a commercial transaction. For this reason, subjecting them to the Rule against Perpetuities has been deemed "a step of doubtful wisdom” (Leach,
 
 Perpetuities in Perspective: Ending the Rule’s Reign of Terror,
 
 65 Harv L Rev 737;
 
 see also,
 
 Dukeminier, A
 
 Modern Guide to Perpetuities,
 
 74 Cal L Rev 1908; Note,
 
 Options and the Rule Against Perpetuities,
 
 13 U Fla L Rev 214, 214-215). As one vocal critic, Professor W. Barton Leach, has explained,
 

 "[t]he Rule grew up as a limitation on family dispositions; and the period of lives in being plus twenty-one years is adapted to these gift transactions. The pressures which created the Rule do not exist with reference to arms-length contractual transactions, and neither lives in being nor twenty-one years are periods which are relevant to business men and their affairs” (Leach,
 
 Perpetuities: New Absurdity, Judicial and Statutory Correctives,
 
 73 Harv L Rev 1318, 1321-1322).
 

 Professor Leach, however, went on to acknowledge that, under common law, "due to an overemphasis on concepts derived from the nineteenth century, we are stuck with the application of the Rule to options to purchase,” urging that "this should not be extended to other commercial transactions”
 
 (id.,
 
 at 1322;
 
 see also,
 
 Simes and Smith, Future Interests § 1244).
 

 It is now settled in New York that, generally, EPTL 9-1.1 (b) applies to options. In
 
 Buffalo Seminary v McCarthy
 
 (86 AD2d 435,
 
 supra),
 
 the court held that an unlimited option in gross to purchase real property was void under the statutory rule against remote vesting, and we affirmed the Appellate Division decision on the opinion of then-Justice Hancock (58 NY2d 867). Since then, we have reiterated that options in real estate are subject to the statutory rule
 
 (see, e.g., Wildenstein & Co. v Wallis,
 
 79 NY2d at 648,
 
 supra).
 

 
 *478
 
 Although the particular option at issue in
 
 Buffalo Seminary
 
 was part of a private transaction between neighboring landowners, the reasoning employed in that case establishes that EPTL 9-1.1 (b) applies equally to commercial purchase options. In reaching its conclusion in
 
 Buffalo Seminary,
 
 the court explained that, prior to 1965, New York’s narrow statutory rule against remote vesting did not encompass options (86 AD2d at 443). A review of the history of the broad provision enacted in 1965, however, established that the Legislature specifically intended to incorporate the American common-law rules governing perpetuities into the New York statute
 
 (id.,
 
 at 441-442).
 

 Because the common-law rule against remote vesting encompasses purchase options that might vest beyond the permissible period, the court concluded that EPTL 9-1.1 (b) necessarily encompasses such options
 
 (id.,
 
 at 443). Inasmuch as the common-law prohibition against remote vesting applies to both commercial and noncommercial options, it likewise follows that the Legislature intended EPTL 9-1.1 (b) to apply to commercial purchase options as well.
 

 Consequently, creation of a general exception to EPTL 9-1.1 (b) for all purchase options that are commercial in nature, as advocated by defendants, would remove an entire class of contingent future interests that the Legislature intended the statute to cover. While defendants offer compelling policy reasons — echoing those voiced by Professor Leach — for refusing to apply the traditional rule against remote vesting to these commercial option contracts, such statutory reformation would require legislative action similar to that undertaken by numerous other State lawmakers
 
 (see, e.g.,
 
 Cal Prob Code § 21225; Fla Stat Annot ch 689.225; Ill Stat Annot ch 765, para 305/4).
 

 Our decision in
 
 Metropolitan Transp. Auth. v Bruken Realty Corp.
 
 (67 NY2d 156,
 
 supra)
 
 is not to the contrary. In
 
 Bruken,
 
 we held that EPTL 9-1.1 (b) did not apply to a preemptive right in a "commercial and governmental transaction” that lasted beyond the statutory perpetuities period. In doing so, we explained that,
 
 unlike options,
 
 preemptive rights (or rights of first refusal) only marginally affect transferability:
 

 "An option grants to the holder the power to compel the owner of property to sell it whether the owner is willing to part with ownership or not. A preemptive right, or right of first refusal, does not
 
 *479
 
 give its holder the power to compel an unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price set by a previously stipulated method”
 
 (id.,
 
 at 163).
 

 Enforcement of the preemptive right in the context of the governmental and commercial transaction, moreover, actually encouraged the use and development of the land, outweighing any minor impediment to alienability
 
 (id.,
 
 at 165-166).
 

 Bruken
 
 merely recognized that the Legislature did not intend EPTL 9-1.1 (b) to apply to those contingent future interests in real property that encourage the holder to develop the property by insuring an opportunity to benefit from the improvements and to recapture any investment
 
 (see Metropolitan Transp. Auth. v Bruken Realty Corp.,
 
 67 NY2d at 165;
 
 Morrison v Piper,
 
 77 NY2d 165, 170). In these limited circumstances, enforcement would promote the purposes underlying the rule.
 

 Bruken,
 
 then, did not create a sweeping exception to EPTL 9-1.1 (b) for commercial purchase options. Indeed, we have since emphasized that options to purchase are to be treated differently than preemptive rights, underscoring that preemptive rights impede alienability only minimally whereas purchase options vest substantial control over the transferability of property in the option holder
 
 (see, Wildenstein & Co. v Wallis,
 
 79 NY2d at 648,
 
 supra; Morrison v Piper,
 
 77 NY2d at 169-170,
 
 supra).
 
 We have also clarified that even preemptive rights are ordinarily subject to the statutory rule against remote vesting
 
 (see, Morrison v Piper,
 
 77 NY2d 165,
 
 supra).
 
 Only where the right arises in a governmental or commercial agreement is the minor restraint on transferability created by the preemptive right offset by the holder’s incentive to improve the property.
 

 Here, the option agreement creates precisely the sort of control over future disposition of the property that we have previously associated with purchase options and that the common-law rule against remote vesting — and thus EPTL 9-1.1 (b) — seeks to prevent. As the Appellate Division explained, the option grants its holder absolute power to purchase the property at the holder’s whim and at a token price set far below market value. This Sword of Damocles necessarily discourages the property owner from investing in improvements to the property. Furthermore, the option’s existence significantly impedes the owner’s ability to sell the property to a third party, as a practical matter rendering it inalienable.
 

 
 *480
 
 That defendants, the holder of this option, are also the lessees of a portion of the premises does not lead to a different conclusion here.
 

 Generally, an option to purchase land that originates in one of the lease provisions, is not exercisable after lease expiration, and is incapable of separation from the lease is valid even though the holder’s interest may vest beyond the perpetuities period
 
 (see,
 
 Berg,
 
 Long-Term Options and the Rule Against Perpetuities,
 
 37 Cal L Rev 1, 21; Leach,
 
 Perpetuities: New Absurdity, Judicial and Statutory Correctives,
 
 73 Harv L Rev 1320; Simes and Smith, Future Interests § 1244). Such options— known as options "appendant” or "appurtenant” to leases— encourage the possessory holder to invest in maintaining and developing the property by guaranteeing the option holder the ultimate benefit of any such investment. Options appurtenant thus further the policy objectives underlying the rule against remote vesting and are not contemplated by EPTL 9-1.1 (b)
 
 (see, Metropolitan Transp. Auth. v Bruken Realty Corp.,
 
 67 NY2d at 165,
 
 supra; see also, Buffalo Seminary v McCarthy,
 
 86 AD2d at 441, n 5,
 
 supra).
 

 To be sure, the option here arose within a larger transaction that included a lease. Nevertheless, not all of the property subject to the purchase option here is even occupied by defendants. The option encompasses the entire building — both the commercial space and the theater — yet defendants are leasing only the commercial space. With regard to the theater space, a disincentive exists for Symphony to improve the property, since it will eventually be claimed by the option holder at the predetermined purchase price.
 

 Furthermore, the option is not contained in the lease itself, but in a separate agreement. Indeed, section 5 of the option agreement specifies that the right to exercise the option is wholly independent from the lease, stating that it "shall not be in any way affected or impaired by * * * performance or nonperformance, actual or asserted, of any obligation to be performed under the Lease or any other agreement.” The duration of the option, moreover, exceeds the term of the lease. Consequently, defendants could compel Symphony to sell them the property even after they have ceased possession as lessee.
 

 Put simply, the option here cannot qualify as an option appurtenant and significantly deters development of the property. If the option is exercisable beyond the statutory perpetuities period, refusing to enforce it would thus further the
 
 *481
 
 purpose and rationale underlying the statutory prohibition against remote vesting.
 

 B. Duration of the Option Agreement
 

 1. Duration Under Section 3 (a) of the Agreement
 

 Defendants alternatively claim that section 3 (a) of the agreement does not permit exercise of the option after expiration of the statutory perpetuities period. According to defendants, only the possible closing dates fall outside the permissible time frame.
 

 Where, as here, the parties to a transaction are corporations and no measuring lives are stated in the instruments, the perpetuities period is simply 21 years
 
 (see, Metropolitan Transp. Auth. v Bruken Realty Corp.,
 
 67 NY2d at 161,
 
 supra).
 
 Section 1 of the parties’ agreement allows the option holder to exercise the option "at any time during any Exercise Period” set forth in section three. Section 3 (a), moreover, expressly provides that the option may be exercised "ai
 
 any time
 
 after July 1, 1979,” so long as the closing date is scheduled during 1987, 1993, 1998 or 2003.
 

 Even factoring in the requisite notice, then, the option could potentially be exercised as late as July 2003 — more than 24 years after its creation in December 1978. Defendants’ contention that section 3 (a) does not permit exercise of the option beyond the 21-year period is thus contradicted by the plain language of the instrument.
 

 Nor can EPTL 9-1.3 — the "saving statute” — be invoked to shorten the duration of the exercise period under section 3 (a) of the agreement. That statute mandates that, "[ujnless a contrary intention appears,” certain rules of construction govern with respect to any matter affecting the Rule against Perpetuities (EPTL 9-1.3 [a]). The specified canons of construction include that "[i]t shall be presumed that the creator intended the estate to be valid” (EPTL 9-1.3 [b]) and "[w]here the duration or vesting of an estate is contingent upon * * * the occurrence of any specified contingency, it shall be presumed that the creator of such estate intended such contingency to occur, if at all, within twenty-one years from the effective date of the instrument creating such estate” (EPTL 9-1.3 [d]).
 

 By presuming that the creator intended the estate to be valid, the statute seeks to avoid annulling dispositions due to inadvertent violations of the Rule against Perpetuities. The provisions of EPTL 9-1.3, however, are merely rules of construe
 
 *482
 
 tian. While the statute obligates reviewing courts, where possible, to avoid constructions that frustrate the parties’ intended purposes (see,
 
 Morrison v Piper,
 
 77 NY2d 165, 173-174,
 
 supra),
 
 it does not authorize courts to rewrite instruments that unequivocally allow interests to vest outside the perpetuities period
 
 (compare,
 
 EPTL 9-1.2 [reducing age contingency to 21 years, where interest is invalid because contingent on a person reaching an age in excess of 21 years]).
 

 Indeed, by their terms, the rules of construction in EPTL 9-1.3 apply only if "a contrary intention” does not appear in the instrument. Thus, as the Practice Commentary explains, "[t]he court cannot validate an unambiguous disposition on the basis of the grantor’s probable intent, but where construction is needed [subd (b)] will be useful in helping to establish the creator’s intent” (Turano, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 9-1.3, at 543).
 

 For example, where a deed contains contradictory phrases, one of which is valid under the Rule
 
 (see, Morrison v Piper,
 
 77 NY2d 165, 173-174,
 
 supra),
 
 or where one of two possible interpretations of a term in an agreement would comply with the Rule
 
 (see, Payne v Palisades Interstate Park Commn.,
 
 204 AD2d 787), the court will adopt the construction validating the disposition
 
 (see also,
 
 Restatement of Property § 375 [1944]). By contrast, an option containing no limitation in duration demonstrates the parties’ intent that it last indefinitely, and EPTL 9-1.3 does not permit "an extensive rewriting of the option agreement * * * so as to make it conform to the permissible period”
 
 (see, Buffalo Seminary v McCarthy,
 
 86 AD2d at 446,
 
 supra).
 

 The unambiguous language of the agreement here expresses the parties’ intent that the option be exercisable "at any time” during a 24-year period pursuant to section 3 (a). The section thus does not permit a construction that the parties intended the option to last only 21 years.
 

 Given the contrary intention manifested in the instrument itself, the saving statute is simply inapplicable.
 

 2. Duration Under Sections 3 (b)-(d) of the Agreement
 

 Section 3 (b), (c) and (d) of the agreement also allow the option to be exercised after the 21-year perpetuities period, which would expire in December 1999.
 

 Section 3 (b) authorizes the option to be exercised "at any time” following the maturity of the mortgage note. The only
 
 *483
 
 limit on duration is found in section
 
 4,
 
 which designates December 31, 2003, to be the latest possible closing date. The option could thus be exercised until October 2003 pursuant to section 3 (b).
 

 Section 3 (c) and (d) each permits exercise of the option for a defined period following a specified contingency. Section 3 (c) is contingent upon termination of the lease; section 3 (d) is contingent upon Symphony’s default on the mortgage. Neither the lease nor the mortgage, however, expires until a date in 2003. The lease could therefore be terminated, or Symphony could default on the mortgage, some time prior to 2003 but after the 21-year period lapses in December 1999. Defendants, in turn, could potentially exercise the option during this interval.
 

 Defendants urge that, under EPTL 9-1.3 (b), (d), we must presume the parties expected these contingencies to occur, if at all, within the 21-year period. A contrary intention, however, appears in the agreement itself. By specifying in section 4 that the closing date could be scheduled as late as December 31, 2003, the parties manifested their expectation that the contingency might occur and the option might be exercised as late as October 2003, well beyond December 1999.
 

 Again, EPTL 9-1.3 (b), (d) cannot "save” these provisions.
 

 C. "Wait and See” Approach
 

 Defendants next urge that we adopt the "wait and see” approach to the Rule against Perpetuities: an interest is valid if it actually vests during the perpetuities period, irrespective of what might have happened
 
 (see,
 
 Dukeminier,
 
 A Modern Guide to Perpetuities,
 
 74 Cal L Rev 1867, 1880). The option here would survive under the "wait and see” approach since it was exercised by 1987, well within the 21-year limitation.
 

 This Court, however, has long refused to "wait and see” whether a perpetuities violation in fact occurs. As explained in
 
 Matter of Fischer
 
 (307 NY 149, 157), "[i]t is settled beyond dispute that in determining whether a will has illegally suspended the power of alienation, the courts will look to what might have happened under the terms of the will rather than to what has actually happened since the death of the testator”
 
 (see also, Matter of Roe,
 
 281 NY 541, 547-548).
 

 The very language of EPTL 9-1.1, moreover, precludes us from determining the validity of an interest based upon what actually occurs during the perpetuities period. Under the statutory rule against remote vesting, an interest is invalid "unless it
 
 must
 
 vest, if at all, not later than twenty-one years after one
 
 *484
 
 or more lives in being” (EPTL 9-1.1 [b] [emphasis added]). That is, an interest is void from the outset if it
 
 may
 
 vest too remotely
 
 (see,
 
 Turano, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 9-1.1, at 481;
 
 see also, Metropolitan Transp. Auth. v Bruken Realty Corp.,
 
 67 NY2d at 163,
 
 supra
 
 ["(t)he validity of the provision must be judged by the circumstances existing at the time of the grant”]). Because the option here could have vested after expiration of the 21-year perpetuities period, it offends the Rule.
 

 We note that the desirability of the “wait and see” doctrine has been widely debated
 
 (see,
 
 5A Powell, Real Property ¶ 827F [1], [3];
 
 see also,
 
 Waggoner,
 
 Perpetuity Reform,
 
 81 Mich L Rev 1718 [describing “wait and see” as “(t)he most controversial of the reform methods”]). Its incorporation into EPTL 9-1.1, in any event, must be accomplished by the Legislature, not the courts.
 

 We therefore conclude that the option agreement is invalid under EPTL 9-1.1 (b). In light of this conclusion, we need not decide whether the option violated Symphony’s equitable right to redeem the mortgage.
 

 IV. REMEDY
 

 As a final matter, defendants argue that, if the option fails, the contract of sale conveying the property from Broad-west to Symphony should be rescinded due to the mutual mistake of the parties. We conclude that rescission is inappropriate and therefore do not pass upon whether Broadwest’s claim for rescission was properly assigned to defendant Pergola.
 

 A contract entered into under mutual mistake of fact is generally subject to rescission
 
 (see, Matter of Gould v Board of Educ.,
 
 81 NY2d 446, 453). CPLR 3005 provides that when relief against mistake is sought, it shall not be denied merely because the mistake is one of law rather than fact. Relying on this provision, defendants maintain that neither Symphony nor Broad-west realized that the option violated the Rule against Perpetuities at the time they entered into the agreement and. that both parties intended the option to be enforceable.
 

 CPLR 3005, however, does not equate all mistakes of law with mistakes of fact
 
 (see, Mercury Mach. Importing Corp. v City of New York,
 
 3 NY2d 418, 427). Rather, the provision
 
 *485
 
 "removes technical objections in instances where recoveries can otherwise be justified by analogy with mistakes of fact”
 
 (id.).
 
 Indeed, this Court has held that the predecessor statute, Civil Practice Act § 112-f, did not mandate the court to grant relief where taxes had been paid on the assumption that a taxing statute subsequently found to be unconstitutional was valid
 
 (id.).
 
 Likewise, CPLR 3005 "does not permit a mere misreading of the law by any party to cancel an agreement” (Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 3005, at 621).
 

 Here, the parties’ mistake amounts to nothing more than a misunderstanding as to the applicable law, and CPLR 3005 does not direct undoing of the transaction
 
 (cf., Gimbel Bros. v Brook Shopping Ctrs.,
 
 118 AD2d 532 [lack of diligence in determining legal obligations under contract did not entitle party to restitution on the ground that it acted under a mistake of law]).
 

 The remedy of rescission, moreover, lies in equity and is a matter of discretion
 
 (Rudman v Cowles Communications,
 
 30 NY2d 1, 13). Defendants’ plea that the unenforceability of the option is contrary to the intent of the original parties ignores that the effect of the Rule against Perpetuities — which is a statutory prohibition, not a rule of construction — is always to defeat the intent of parties who create a remotely vesting interest. As explained by the Appellate Division, there is "an irreconcilable conflict in applying a remedy which is designed to void a transaction because it fails to carry out the parties’ true intent to a transaction in which the mistake made by the parties was the application of the Rule against Perpetuities, the purpose of which is to defeat the intent of the parties” (214 AD2d 66, 80).
 

 The Rule against Perpetuities reflects the public policy of the State. Granting the relief requested by defendants would thus be contrary to public policy, since it would lead to the same result as enforcing the option and tend to compel performance of contracts violative of the Rule. Similarly, damages are not recoverable where options to acquire real property violate the Rule against Perpetuities, since that would amount to giving effect to the option
 
 (see,
 
 5A Powell, Real Property ¶ 771 [3]).
 

 Accordingly, the order of the Appellate Division should be
 
 *486
 
 affirmed, with costs, and the certified question answered in the affirmative.
 

 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, etc.