In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-3151, 09-3265

AMERICAN LAND HOLDINGS OF INDIANA, LLC, *et al.*,

*Plaintiffs-Appellants/*
*Cross-Appellees,*

*v.*

STANLEY JOBE, *et al.*,

*Defendants-Appellees,*

and

WILLIAM BOYD ALEXANDER,

*Defendant-Appellee/*
*Cross-Appellant.*

Appeals from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:08-cv-0448-WTL-WGH—**William T. Lawrence**, *Judge*.

ARGUED MARCH 30, 2010—DECIDED MAY 6, 2010

Before POSNER, ROVNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. This diversity suit, brought by affiliates of the Peabody Energy Corporation (for simplicity we'll pretend there is a single plaintiff and call it Peabody), seeks both a declaration that Peabody has the right to strip mine coal on the defendants' land, and specific performance of an option to purchase the land. The land is in Indiana, and the substantive issues in the case are governed by Indiana law. The district judge, after conducting a bench trial, entered judgment for the defendants, 655 F. Supp. 2d 882 (S.D. Ind. 2009), and Peabody appeals. One of the defendants (Alexander) cross-appeals—improperly, because he is seeking not to modify the judgment but merely to defend it (so far as it affects him) on an alternative ground to the district judge's. *WellPoint, Inc. v. Commissioner*, 599 F.3d 641, 647-51 (7th Cir. 2010). The other defendants also filed a cross-appeal, but have dismissed it.

The defendants own a total of 62 acres of farmland in Sullivan County, Indiana; there are farmhouses and other buildings on the land. The land is an island in an area that Peabody is busy strip mining for coal, and it is eager to strip mine the defendants' land as well, and insists that a 1903 deed entitles it to do so. The coal beneath the land is worth $50 million (of course minus the cost of extraction) at the current spot price of $42 per ton for coal of this type and quality. The parties say the coal is worth $180 million, but that appears to be an arithmetical error; for the quantity of coal that Peabody expects to extract if it is allowed to strip mine the land is only 1.2 million tons. (There is, however, more at stake for Peabody, because if it cannot extend its

existing strip mine across the defendants' land it will apparently be unable to get at another 2.5 millions tons of coal in the land immediately surrounding the defendants' land.)

Peabody contends that the deed entitles it both to strip mine the land without compensating the owners and also, if it wants, to obtain full title to the land (that is, fee simple) for $30 an acre. Under the first entitlement the right to use the surface would revert to the defendants when Peabody was finished strip mining it; under the second it would be Peabody's property to do with it as it wanted, forever. One might wonder why Peabody would prefer litigating rather than just digging an underground mine, as the deed allows. But the district judge found that strip mining was necessary to remove all the coal—underground mining wouldn't do it because the coal seams aren't very thick and in places they are layered over one another so that a good amount of the coal would have to be left in place in order to support the shafts required for getting at and extracting the rest of the coal.

The deed, given by the defendants' predecessors to Peabody's predecessor, grants the latter and its successors "all the coals, clays, minerals and mineral substances underlying" the defendants' land, "together with the right to mine and remove said coals [etc.—we can ignore the reference to 'clays, minerals and mineral substances,' as do the parties] without further payment of any nature whatsoever." Moreover, the coal company is not to be liable for any damages "occasioned by mining or removing of said coals . . . not to exceed

5 acres"—in other words, it can damage five acres of the defendants' 62 acres without having to pay for the damage. And "at any time hereafter upon demand and payment therefor at rate of $30 per acre," the grantors are to convey to the coal company "without further payments . . . such portion of surface of said Real Estate as may be necessary for location of coal mines, tracks, tipples, railroads, railroad switches and all buildings necessary to carry on business of mining and transporting said . . . coal." The coal company is also "granted the use of so much of surface of said Real Estate as may be necessary in putting down test holes and holes for pumping water from and for ventilating and draining mines and for other like purposes necessary to secure [the coal company's] mining and removing that portion of said Real Estate thereby granted and conveyed to it." However, "no . . . coal . . . [is] to be mined or removed from under any dwelling house now situated on said Real Estate," and "five acres of surface where present buildings are now situated is reserved by the grantors." Peabody argues that the conveyance of "all the coals" means that it owns all the coal under the surface of the defendants' land and so, since the deed entitles it "to mine and remove" the coal, it can extract it by any method it wants, including strip mining.

But the further portions of the deed that we quoted seem to confine the coal company's use of the surface to structures and activity relating to underground mining. For $30 an acre the company can purchase portions of the surface for structures related to such mining, but removal of the surface for purposes unrelated to under-

ground mining is nowhere authorized unless by the reference to "all the coals."

The tension between the right to mine "all the coals" and the limits on the mining company's use of the surface of the land marks the deed as ambiguous. And so the judge admitted extrinsic evidence (evidence beyond the deed itself) to help him decide whether the deed had conveyed, either directly or by grant of the purchase option, the right to strip mine the land. Extrinsic evidence is admissible to disambiguate an ambiguous deed, *Symmes v. Brown*, 13 Ind. 318 (1859); *Hoose v. Doody*, 886 N.E.2d 83, 89-90 (Ind. App. 2008); *Kopetsky v. Crews*, 838 N.E.2d 1118, 1124 (Ind. App. 2005); *United States v. LaRosa*, 765 F.2d 693, 696-97 (7th Cir. 1985) (Indiana law), just as it is admissible to disambiguate an ambiguous contract.

The key extrinsic evidence presented at the bench trial was that there was no strip mining of coal in Sullivan County, Indiana, in 1903; and apparently no strip mining of coal anywhere in the United States at that time, beyond isolated experimentation. See Denver Harper, Chris Walls & Deborah DeChurch, "Coal Mining History of the United States With an Emphasis on Indiana" (Indiana Geological Survey 2003), igs.indiana.edu/geology/coalOilGas/coalMiningHistory/coal_history.html (visited April 12, 2010); Denver Harper, "The Development of Surface Coal Mining in Indiana" 5-7 (Indiana Dept. of Natural Resources, Geological Survey Special Report No. 35, 1985). Commercially significant strip mining had to await the advent of the huge steam shovels developed for the construction of

the Panama Canal, which began in 1904. Strip mining even on a modest scale seems not to have been done in Sullivan County until 1918, or to have become common anywhere in Indiana until the 1920s. See Harper *et al.*, *supra*; Harper, *supra*, at 7-11; Harper, "Coal Mining in Sullivan County, Indiana" 2 (Indiana Dept. of Natural Resources, Geological Survey Special Report No. 43, 1988). The defendants' expert witnesses testified consistently with the published sources; Peabody offered no expert testimony relating to the history of strip mining in Indiana.

The judge concluded that the right to mine "all the coals" referred to extracting the coal beneath the surface of the defendants' land by underground mining only. That explained, he thought, why all the surface uses permitted to the coal company, and the purchase option as well, related expressly to underground mining—none to strip mining. His conclusion that the deed is ambiguous and the infeasibility of strip mining at the time it was granted allows the ambiguity to be resolved in favor of the surface owner is consistent with the case law. *Phillips v. Fox*, 458 S.E.2d 327, 335 (W. Va. 1995); *Skivolocki v. East Ohio Gas Co.*, 313 N.E.2d 374, 376, 378-79 (Ohio 1974); *Stewart v. Chernicky*, 266 A.2d 259, 262-65 (Pa. 1970); *West Virginia-Pittsburgh Coal Co. v. Strong*, 42 S.E.2d 46, 47-50 (W. Va. 1947); cf. *Compass Coal Co. v. Commonwealth of Pennsylvania Game Commission*, 454 A.2d 1167 (Pa. Commonwealth Ct. 1983). The Indiana Supreme Court has not spoken to the issue. But Peabody argues that Indiana's intermediate appellate court has held in a pair of successive cases—*Consolidation Coal*

*Co. v. Mutchman*, 565 N.E.2d 1074 (Ind. App. 1990), and *Mutchman v. Consolidation Coal Co.*, 666 N.E.2d 461 (Ind. App. 1996)—that a conveyance of the right to mine "all coal" (the phrase in our deed is "all the coals," but presumably the meaning is the same) can be limited to underground mining only if the deed imposes a "severe limitation" on the mining company's use of the surface, whatever exactly that means.

Assuming that these intermediate appellate decisions are authoritative statements of Indiana law, nevertheless we don't read them as Peabody does. In the first *Mutchman* case the court was interpreting a large number of heterogeneous deeds granting coal rights, and the court noted that two sets of the deeds "appear to severely limit surface use, either by expressly stating that it is not the intention of the grantors to 'grant any surface rights,' or requiring the grantee to accommodate surface farming and pay damages for crops as the damage occurs." 565 N.E.2d at 1082. That was an observation rather than the statement of a rule. The court said that the deeds were ambiguous and so, "to construe [them], it would be appropriate to permit the introduction of extrinsic evidence to aid in construction." *Id.* at 1083. It further observed that they "expressly preclude use of the surface or . . . require immediate payment of damages for injury to the surface." *Id.*

On remand from the first *Mutchman* decision by the appellate court, the trial court received evidence which showed that in 1922, when the deeds in question had been issued (the date is not in the *Mutchman* opinion, but is in the briefs in that case), "strip mining

methods were being used in the counties surrounding [the county in which the grantors' land was located]; and it was most likely the grantors of the coal deeds were aware of the probability that their coal was being acquired for strip mining . . . [and] would have been aware of the widespread solicitation of land for strip mining purposes." 666 N.E.2d at 465-66. The appellate court concluded that "from this evidence, we cannot say it was unreasonable for the trial court to conclude that the grantors had knowledge that the surface coal could be removed by strip mining methods, and, if the grantors did not want their land strip mined, they could have clearly limited the use of the surface to preclude strip mining." *Id*. at 466.

Neither appellate opinion in the *Mutchman* case holds that *only* a "severe limitation" on a coal company's right to use the surface of the land to get at its coal can exclude, from a grant of the right to mine "all coal" or "all the coals," coal that can be extracted only by strip mining. We read the court to be saying that, consistent with the cases we cited earlier, if the deed both grants the coal company the right to mine "all the coals" and imposes restrictions inconsistent with a literal interpretation of that right the deed is ambiguous and extrinsic evidence can properly be used to disambiguate it. A conveyance that contains a contradiction must be interpreted with the help of something more than the inconsistent text and that something usually and in this case, as in *Mutchman*, is extrinsic evidence.

The deed in our case satisfies the condition that it be ambiguous (thus allowing recourse to extrinsic evi-

dence) because it imposes a number of restrictions, and in fact rather onerous ones, on the coal company's use of the surface; to get free of most of them the company would have to pay the grantors $30 per acre, which is the equivalent of having to pay damages for impairing the landowners' use of the surface, a restriction similar to one mentioned in *Mutchman*. The deed forbade the company to take coal from under the defendants' buildings or the five acres on which the buildings sat (plus yards presumably, since apparently there was only one farmhouse in 1903 plus some farm buildings, and the ensemble would not have occupied five acres). Peabody acknowledges that if it had to leave five acres of the surface untouched it might be unable to recover most of the coal beneath the defendants' land.

It tries to sneak around this limitation by arguing that since the contours of the five-acre reserved tract are not indicated in the deed, the reservation is void under Indiana property law because its boundaries cannot be determined. True, *Edens v. Miller*, 46 N.E. 526 (Ind. 1897); *De Long v. Starkey*, 92 N.E.2d 228, 230 (Ind. App. 1950); 10 *Indiana Law Encyclopedia (Deeds)* § 17 (2010); see also Barlow Burke, Ann M. Burkhart & R.H. Helmholz, *Fundamentals of Property Law* 490 (2d ed. 2004), but a two-edged sword: if the five-acre tract carved out of the 62-acre grant is indefinite (and the indefiniteness cannot be resolved by extrinsic evidence), as appears to be the case, the 57-acre tract in which Peabody does have mineral rights is equally indefinite. Anyway the indefiniteness is irrelevant. The only significance of the five-acre reservation for the case at hand is the light it

casts on the parties' understanding of what the deed granted the coal company: the grantors could hardly have thought that the reservation was void and the coal company's rights therefore more extensive than the deed said they were.

So the 1903 deed is richly ambiguous, like the comparable deeds in the *Mutchman* cases. But there is a critical difference between this case and *Mutchman*, and it is the difference between 1903 and 1922. By 1922 it was clear that a coal company seeking a grant of "all coal" might seek to strip mine it, but nineteen years earlier strip mining of coal had been unknown and apparently unanticipated. And notice that Peabody's claim produces a paradox: if Peabody built a rail line to the entrance to an underground mine, it would have to pay $30 per acre for the surface occupied by the track; but if it destroyed the surface completely by strip mining, it would, on its interpretation of the deed, owe nothing.

The difference between strip mining and underground mining, as far as the effect on the grantor of the mining rights is concerned, is profound: strip mining destroys the surface, making it completely unusable by the owner of the surface unless and until it is restored after all the coal has been stripped, while underground mining allows some and maybe almost all of the surface to remain undisturbed and thereby usable by the surface owner. On this basis, some courts create a presumption against interpreting a grant of mineral rights to convey a right to strip mine the grantor's land. E.g., *Phillips v. Fox*, *supra*, 458 S.E.2d at 332-35; *Skivolocki v.*

*East Ohio Gas Co.*, *supra*, 313 N.E.2d at 377-79 and n. 1; *Stewart v. Chernicky*, *supra*, 266 A.2d at 263; *Compass Coal Co. v. Commonwealth of Pennsylvania Game Commission*, *supra*, 454 A.2d at 1169-70; see also *Ward v. Harding*, 860 S.W.2d 280, 282-88 (Ky. 1993); *Doochin v. Rackley*, 610 S.W.2d 715, 718-19 (Tenn. 1981); *Wilkes-Barre Township School District v. Corgan*, 170 A.2d 97, 99-100 (Pa. 1961); *West Virginia-Pittsburgh Coal Co. v. Strong*, *supra*, 42 S.E.2d at 49-50. We don't have to go that far to conclude that the district judge did not commit a clear error (the proper standard of appellate review of a decision interpreting a contract, deed, or other document with the aid of extrinsic evidence, e.g., *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 873 (7th Cir. 1985)) in ruling that, in light of the language of the deed read against a background that includes the technology of coal mining when the deed was signed, the grant of a right to mine "all the coals" was intended to be limited to underground mining, and likewise the right to use the surface to enable mining.

For completeness we address the two alternative grounds for affirmance proposed by the defendants. One, which is limited to Peabody's claim for specific performance of the option to purchase the defendants' land, is that the option violates the rule against perpetuities, which remains in force in Indiana. Ind. Code §§ 32-17-8-1 *et seq.* (Uniform Statutory Rule Against Perpetuities). For property interests created as in this case before 1991 (the date of the Indiana statute), the common law rule against perpetuities continues to govern, see section 32-17-8-1(b), and invalidates the grant of a property

interest that goes into effect more than 21 years and nine months after the death of a person living when it was made. *Francis v. Yates,* 700 N.E.2d 504, 506 (Ind. App. 1998); *Buck v. Banks,* 668 N.E.2d 1259, 1260-61 (Ind. App. 1996); see also Ind. Code § 32-1-4-1 (1982). If the grantee is a corporation and the agreement doesn't use a person's life as a measuring rod for the vesting deadline, the grant must go into effect within 21 years. E.g., *Murphy Exploration & Production Co. v. Sun Operating Limited Partnership*, 747 So. 2d 260, 265 (Miss. 1999); *Symphony Space, Inc. v. Pergola Properties, Inc.*, 669 N.E.2d 799, 806 (N.Y. 1996); see also *Restatement of Property* § 374, comments h and o (1944). We haven't found an Indiana case, but we assume that the Indiana rule is the same.

There is a crucial difference between the going into effect of a granted right and the exercise of the right by its holder once it has gone into effect. If the 1903 deed conveyed the right to strip mine, which is Peabody's primary argument, that right took effect in 1903, even though strip mining did not begin then. Similarly, the right to mine (if only by underground mining) the coal under the defendants' land took effect in 1903 and so would not have been forfeited even if the mining of the coal had not begun until 2000. The right to mine is an "appurtenant" right, meaning a right (which may be granted expressly, as in the deed involved in this case, or by implication, as when a landowner sells a parcel wholly surrounded by his land and the purchaser is deemed to have an implied easement of ingress and egress through the seller's property) that is necessary to the full exploitation of another property right. The right

to mine coal is appurtenant to the ownership of a coal deposit, for without that right the coal would have severely diminished value to its owner (though not zero value, because the owner of the surface would have an incentive to buy the coal from the owner of the coal). To subject the exercise of an appurtenant right to the rule against perpetuities would therefore encourage premature exploitation of the right.

Suppose that after the sale of coal rights to Peabody's predecessor in 1903 the price of coal had plummeted or the cost of extraction had soared and as a result mining the coal was uneconomical, but that conditions gradually improved and in 1923 the coal company judged that mining the coal would be profitable beginning in 1925. If to preserve its right to mine, the coal company had to begin mining within 21 years of acquiring the right, it would have an incentive to begin mining prematurely, in order to preserve its right. And that would be wasteful. See, e.g., *Quarto Mining Co. v. Litman*, 326 N.E.2d 676, 685 (Ohio 1975); Douglas A. Kysar, "Law, Environment, and Vision," 97 *Nw. U. L. Rev.* 675, 698-99 (2003); Robert C. Ellickson, "Property in Land," 102 *Yale L.J.* 1315, 1368-69 (1993). In effect, it would be mining to acquire a right to mine in the future, rather than mining because it wanted to extract and sell the coal now.

Consistent with this analysis, we read in *Threlkeld v. Inglett*, 124 N.E. 368, 371 (Ill. 1919) (citations omitted), that "when anything is granted, all the means to attain it and all the fruits and effects of it are granted also, and pass, together with the grant of the thing itself, without any

words to that effect. Where a grant is made for a valuable consideration it is presumed that the grantor intended to convey and the grantee expected to receive the full benefit of it, and therefore the grantor not only conveyed the thing specifically described, but all other things, so far as it was within his power to pass them, which were necessary to the enjoyment of the thing granted. The deed, when made, would not only pass the coal, oil, and gas, with the right to mine and remove the same, but also the right to enter upon and use so much of the surface of the land as might be necessary to the enjoyment of the property and rights conveyed, and the agreement was merely that the land taken for such use should be paid for, when located, at the rate of $150 an acre. It was not within the rule against perpetuities."

The district judge as we said was entitled to reject Peabody's contention that the 1903 deed conveyed to its predecessor the right to strip mine the defendants' land. But not because Peabody (or its predecessor) failed to begin strip mining the land by 1924. Peabody also claims, however, that the deed gave it an option to buy all the defendants' land at any time for $30 an acre—an option that Peabody sought to exercise more than 21 years after its predecessor acquired the option. That option is the target of the defendants' attack based on the rule against perpetuities. There is a difference, pointed out in *Post v. Bailey*, 159 S.E. 524, 526-27 (W.Va. 1931), between the present grant of a right to the use of land and an option to acquire that right in the future. In the latter case, the grant, because it does not take effect until the

option is exercised, *is* subject to the rule against perpetuities. *West Virginia-Pittsburgh Coal Co. v. Strong*, *supra*, 42 S.E.2d at 50-52; *Barton v. Thaw*, 92 A. 312, 315 (Pa. 1914).

Not that "option" is a magic word, the mere utterance of which conjures up the rule. *Buck v. Walker*, 132 N.W. 205, 208 (Minn. 1911). The word is sometimes used to designate an appurtenant right, as when one says that by acquiring land zoned residential one acquired an "option" to build a house, or not, as one chooses, at any time. But that is different from an option to buy an adjacent property—*that* is a right to the future grant of a property right. And so the purchase option granted in the 1903 deed would be extinguished by the rule against perpetuities were the option interpreted to enable Peabody to buy the defendants' land in order to strip mine it rather than just to use parts of it to enable underground mining. But we have rejected that interpretation. The deed we have said permits the purchase of the surface only as may be necessary for mining operations underground. The grant of *that* option is the grant of an appurtenant right that Peabody can exercise at any time. *Consolidation Coal Co. v. Mutchman*, *supra*, 565 N.E.2d at 1084-85; *Quarto Mining Co. v. Litman*, *supra*, 326 N.E.2d at 683-85. If the right were not appurtenant to Peabody's (limited) mining right—if it were a right to build a ferris wheel on the defendants' land—then it would be subject to the rule against perpetuities. But it is not a right to strip the surface.

The other alternative ground, this one pressed only by defendant Alexander, on which we are urged to affirm the

district court's decision (but only insofar as it relates to Alexander) is that both federal law and Indiana law forbid strip mining within 300 feet of a residence, and all of Alexander's land (it is only three acres) is within that radius of his house. 30 U.S.C. § 1272(e); 312 Ind. Admin. Code § 25-3-1(5). But if the deed gave the coal company the right to acquire the surface (for any and all purposes, including strip mining) for $30 an acre, the company could exercise the right, tear down the house, and be then free of legal restrictions on strip mining the land.

Because strip mining is a more valuable use of the defendants' land than farming and home occupying, our decision will not prevent the land from being put to its most valuable use, which is indeed for strip mining. It will simply affect the terms on which Peabody acquires the right to strip mine the land. It would like to be able to acquire the right for $1860 (62 acres times $30). With $50 million worth of coal under the land (though its net value, as we said earlier, is less because of the cost of extraction—but may be more because Peabody needs to strip mine the defendants' land in order to extract more coal from beneath the surrounding land), it will have to pay the defendants a good deal more.

The judgment is affirmed and the cross-appeal denied.