# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-2268, 10-2305, 10-2313, 10-2850

ENBRIDGE PIPELINES (ILLINOIS) L.L.C.,

*Plaintiff-Appellee,*

*v.*

MICHAEL S. MOORE, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Courts for the
Central and Southern Districts of Illinois.
Nos. 08-2215, *et al.*; 08-cv-697-DRH, *et al.*
**Harold A. Baker,** *Judge,* and **David R. Herndon**, *Chief Judge.*

ARGUED DECEMBER 1, 2010—DECIDED JANUARY 24, 2011

Before BAUER and POSNER, *Circuit Judges*, and
PALLMEYER, *District Judge.*[*]

POSNER, *Circuit Judge*. Before us for decision are con-
solidated appeals from judgments, all in favor of the
plaintiff, in 18 lawsuits brought in two federal district
courts in Illinois under the diversity jurisdiction. (Origi-

___

[*] Hon. Rebecca R. Pallmeyer, of the Northern District of
Illinois, sitting by designation.

nally there were 25 suits; three of the other seven were settled; presumably the defendants in the other four simply accepted their defeat.) Illinois law is agreed to govern the substantive issues. The plaintiff, Enbridge, sought in each suit a declaration that its easement to operate an oil pipeline under the defendant's property is—as the defendants deny—still in force. The district judges granted summary judgment for Enbridge in each of the cases, and entered the declaration that it sought.

Enbridge is trying to build a 170-mile-long pipeline in Illinois as part of a larger project of pipeline construction to meet increased American demand for Canadian oil. A 120-mile segment of the 170-mile construction route already contains a pipeline, though it has only a 10-inch diameter and has not been in use for many years. The construction and operation of that pipeline, built in 1939, was made possible by easements granted to a predecessor of Enbridge by the farmers owning the land under the surface of which the pipeline passes. Enbridge wants to replace the 10-inch pipeline with a 36-inch one. The defendants contend that Enbridge's predecessors (the existing pipeline has had several owners since it was built), and hence Enbridge, have forfeited the easements by failing to maintain the pipeline in good working condition.

The easements gave the original grantee "the right to lay, operate, and maintain a pipe line for the transportation of oil, gasoline and/or other fluids," and gave "its successors and assigns"—thus including Enbridge—the same rights "so long as such pipe lines or other struc-

tures are maintained." The holder of the easement must pay the landowner "for any and all damages to crops owned by [him], fences, and land which may be suffered from the construction, operation or maintenance of such pipe lines." (The parties attach no significance to the fact that "pipe line" is singular in the first clause and plural in the others.) The existing pipeline had been inactive for almost a quarter of a century when Enbridge acquired it and the easements, and, according to the defendants, was in a state of disrepair. They contend that cathodic protection (running an electrical current through the pipeline to prevent rust) had been neglected; missing segments of the pipe had not been replaced (thus disrupting the electrical current at times when the pipeline owner did try to provide cathodic protection); valves and pumps had not been maintained and some of them had been removed and not replaced; the interior of the pipeline had not been cleaned and various seam and joint failures had not been repaired.

The defendants' allegations are exaggerated. Although the pipeline was indeed not in use between 1988 and 2006, considerable maintenance was performed in 1992, 1993, and 2004. There is no evidence of any missing segments, and an engineer who performed 27 "integrity digs" (excavations for the purpose of inspection) testified that "the pipeline is capable of transporting liquid." His affidavit described "the pipeline [as] close to being as good as new and could with relative ease be placed back into active service as a crude oil line, a gas line, or a water line."

One of the district judges determined, in disagreement with the defendants' allegations, that maintenance appropriate for an inactive pipeline had been conducted; the other that the easements were valid as long as the pipeline remained in existence, no matter how dilapidated it became.

A threshold question is whether, as the diversity statute requires, the amount in controversy in each of the suits exceeds $75,000. 28 U.S.C. § 1332. Enbridge alleged in its complaints that it did. Most though not all of the defendants denied the allegation, though without presenting any evidence or reason to doubt its truth. A plaintiff is required to supply "competent proof" of the amount in controversy if the "jurisdictional facts are challenged by his adversary in any appropriate manner." *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936). But what is an "appropriate manner"? The cases do not appear to require more than a bare denial to put the plaintiff to his proof, see, e.g., *McMillian v. Sheraton Chicago Hotel & Towers*, 567 F.3d 839, 844-45 (7th Cir. 2009); *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir. 1995), even if the result is merely to slow down litigation and increase its costs. But no matter; Enbridge did respond to the defendants' denial, presenting evidence that to build its pipeline around the defendants' properties would cost at least $75,000, per property, in pipe alone, ignoring construction costs, which would bring the total cost well above $75,000.

The defendants reply that maybe Enbridge wouldn't have to do any building around; maybe it could buy a

new easement in each of the defendants' properties for less than $75,000. But why for less? If it would cost Enbridge at least $75,000 to build around a property, it should be willing to pay that amount for an easement for the pipeline in its current location—even more, when construction costs are taken into account, not to mention the possible unwillingness of a neighboring property owner to allow Enbridge to build the pipeline on his property without payment of a substantial price for an easement. There are also costs of cumulative delay to be considered. To build around one or two properties would delay the completion of the new pipeline (the 36-inch replacement for the existing 10-inch one) by only a little. But to build around 25 properties? And any delay, by postponing the day on which Enbridge begins to earn revenues from the pipeline project, would impose costs. These additional costs would increase the amount that Enbridge would be willing to pay to buy a new easement from each of the defendants. Knowing all this, each defendant would demand a very high price.

The district court was thus on solid ground in concluding that Enbridge had satisfied the amount in controversy requirement with respect to all of the defendants' properties. See *McCarty v. Amoco Pipeline Co.*, 595 F.2d 389, 391-95 (7th Cir. 1979).

One further point needs to be made about the jurisdictional issue. Some of the defendants did not challenge Enbridge's allegation about the amount in controversy until the appeal. That delay was not fatal because a challenge to subject-matter jurisdiction is timely until at

least the entry of a final judgment after exhaustion of further judicial remedies. *Travelers Indemnity Co. v. Bailey*, 129 S. Ct. 2195, 2205-06 (2009); *Dexia Credit Local v. Rogan*, 602 F.3d 879, 883 (7th Cir. 2010). But a defendant who lies back, holding such a challenge in reserve because he hopes to obtain a judgment on the merits (which unlike a dismissal for want of subject-matter jurisdiction would preclude refiling a diversity suit in state court), in which event he would not raise a jurisdictional objection, engages in misconduct for which he can be disciplined. See *BEM I, L.L.C. v. Anthropologie, Inc.*, 301 F.3d 548, 551-52 (7th Cir. 2002); *Aves ex rel. Aves v. Shah*, 997 F.2d 762, 767 (10th Cir. 1993); see also *Mansfield, Coldwater & Lake Michigan Ry. v. Swan*, 111 U.S. 379, 388-89 (1884); *Belleville Catering Co. v. Champaign Market Place, L.L.C.*, 350 F.3d 691, 694 (7th Cir. 2003); *In re Brand Name Prescription Drugs Antitrust Litigation*, 248 F.3d 668, 670 (7th Cir. 2001).

On to the merits. The word "maintain" is ambiguous. So far as bears on this case it can mean engage in maintenance, as when one says that one's antique auto has been maintained in mint condition, or it can just mean occupied or retained, as when one says that one maintains an office at Dearborn and Adams. The latter is the more plausible interpretation of the word as it appears in the relevant clauses of the easements. The reasons are the economic value of well-defined property rights and the undesirability of inducing heavy expenditures merely to preserve a right. A rule that forfeited a person's property right because he'd failed to maintain the property in good condition would cast a cloud of

debilitating uncertainty over property rights, as well as induce expenditures on maintenance intended not to enable the productive use of the property but merely to avoid forfeiture of the property right. Rational parties to a conveyance of a property right would not negotiate for such consequences.

An easement can, it is true, be abandoned, and when that happens the rights granted by it revert to the easement's grantor. E.g., *Chicago Title & Trust Co. v. Wabash-Randolph Corp.*, 51 N.E.2d 132, 139 (Ill. 1943); *Gacki v. Bartels*, 859 N.E.2d 1178, 1186 (Ill. App. 2006); *Penn Central Corp. v. United States R.R. Vest Corp.*, 955 F.2d 1158, 1159-60 (7th Cir. 1992); *Borough of Columbia v. Surface Transportation Board*, 342 F.3d 222, 225-26 and n. 2 (3d Cir. 2003). But "abandonment" in the law of property is a deliberate act, *Beloit Foundry Co. v. Ryan*, 192 N.E.2d 384, 391 (Ill. 1963); *Diaz v. Home Federal Saving & Loan Ass'n*, 786 N.E.2d 1033, 1043 (Ill. App. 2002); *Johnston v. Cornelius*, 218 P.3d 129, 135-36 (Or. App. 2009), not a synonym for poor maintenance or, in the grants in question in this case, for failure to "maintain" the pipeline, because a contrary reading would engender wasteful maintenance. The original pipeline was not in use for many years. Should the owners have had to spend money on maintenance, just to preserve their easements? What good would that have done anyone? The owners did not intend to abandon the easements; they foresaw the possibility that demand for transportation of oil by pipeline would someday justify placing the pipeline (or a replacement) into service, but there was no economic

justification for keeping the pipeline in operating condition until then.

The defendants will not acknowledge the difference between a right of property (ownership) and a right merely of use. A property right confers on its owner among other benefits an option not to develop or exploit his property immediately or continuously—often a valuable option, as where land is bought with the expectation that economic conditions will warrant its development as a residential subdivision ten years hence, or land containing oil shale is bought with the intention of extracting oil at some future time when oil prices will justify the expense of extraction. An investor who believes that development would be premature may be willing to pay more for the property than someone who wants to develop it immediately, and it would be a mistake to burden far-sighted investment by conditioning ownership on use. *American Land Holdings of Indiana, LLC v. Jobe*, 604 F.3d 451, 458 (7th Cir. 2010); Douglas A. Kysar, "Law, Environment, and Vision," 97 *Nw. U. L. Rev.* 675, 698-99 (2003); Robert C. Ellickson, "Property in Land," 102 *Yale L.J.* 1315, 1368-69 (1993).

One can imagine a reading of the word "pipeline" in the easement that would equate it not to the pipe itself but to the pipe*line* in the sense of a route for transporting oil, just as one might speak of an "air corridor" between New York and Chicago even if no airlines were operating between those cities. Maintaining the pipeline would then just mean preserving the option to use the easements for future transportation of oil, even if the

existing pipeline crumbled to dust. But one of the phrases we quoted from the conveyances that created the easements—"such pipe lines or *other* structures" (emphasis added)—implies that the word "pipe lines" refers to the physical pipeline, not the easements. On this reading, the dismantlement of the pipe would have terminated the easements. Cf. *Chicago & Eastern Ill. R.R. v. Clapp*, 66 N.E. 223, 225 (Ill. 1903); *Schnabel v. County of DuPage*, 428 N.E.2d 671, 679 (Ill. App. 1981). Yet even this reading would not defeat Enbridge's claim. The successive owners of the original 10-inch pipeline maintained it at a level at which it could have been put back into service with additional expenditures to clear out the rust and replace broken parts. That minimal maintenance, preserving the option of a future use not just of the easements but of the existing physical pipeline, was enough to establish that the owners maintained the pipeline within any meaning that could reasonably be assigned to the easements and had no intention of abandoning it, for if they had intended to do so they wouldn't have spent even a penny on maintenance.

The district courts had jurisdiction and the easements have not been forfeited. The judgments are therefore

AFFIRMED.